Filed 2/6/14  P. v. Vardanyan CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B239964 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA064518) |
| v. | |
| VARDAN VARDANYAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Michael D. Carter, Judge.  Affirmed as modified.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Jonathan J. Kline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Vardan Vardanyan appeals from a judgment of conviction, in which a jury found him guilty of four counts of attempted murder (Pen. Code §§ 664, 187, subd. (a))[1] and four counts of assault with a semiautomatic firearm (§ 245, subd. (b)).  The jury also found true various allegations, including the use of firearms, gang allegations, and that one of the attempted murders was committed willfully, deliberately, and with premeditation.  The trial court sentenced appellant to state prison for seven years four months plus 90 years to life.[2]

Appellant contends the trial court violated his right to due process by (1) denying his motion to suppress identification evidence based on a photographic six-pack lineup that did not contain other Armenians, (2) denying his motion in limine to exclude his involuntary statements to police, and (3) denying his motion for a new trial based on newly discovered evidence.  We disagree and affirm the judgment as modified.

---

[1]     All further statutory references are to the Penal Code, unless otherwise indicated.

[2]      The trial court ordered appellant to pay $160 in court security assessments (§ 1465.8, subd. (a)(1)), $120 in criminal conviction assessments (Gov. Code, § 70373), and a $200 restitution fine (§ 1202.4, subd. (b)).  A $200 parole revocation fine (§ 1202.45) was imposed and stayed.

The People contend, and appellant does not object, that additional assessments should have been imposed.  We agree.  The $40 court security assessment pursuant to section 1465.8, subdivision (a)(1), should have been imposed on each of appellant's eight convictions, for a total of $320 in court security assessments.  (See *People v. Roa* (2009) 171 Cal.App.4th 1175, 1181.)  The $30 criminal conviction assessment pursuant to Government Code section 70373 also should have been imposed on each of appellant's eight convictions, for a total of $240 in criminal conviction assessments.  (See *People v. Lopez* (2010) 188 Cal.App.4th 474, 480.)  An unauthorized sentence may be corrected at any time.  (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6; *People v. Pelayo* (1999) 69 Cal.App.4th 115, 122; *In re Sandel* (1966) 64 Cal.2d 412, 418–419 [People have a duty to seek correction of an unauthorized sentence].)

**FACTS**

**Prosecution Case[3]**

### A. The Shootings

On January 28, 2006, at around 5:30 p.m., 16-year-old Avetis Melikyan (Melikyan) was at Connal's restaurant on Washington Boulevard in Pasadena with his friends, including the three covictims, Arthur Sashoyan, Hovik Ashikyan and Arman Gasparian (Gasparian), and three other friends. Melikyan had told his friends that he would need them "to back him up" at Connal's because he was supposed to meet appellant, whom he knew as "Scrappy" from the Armenian Power gang. While they were waiting on the patio, a green BMW pulled into the parking lot and four occupants got out. Melikyan went over and talked to appellant. One of appellant's cohorts punched Melikyan in the head, prompting his friends to come to his aid. Appellant then withdrew a gun and began firing at Melikyan's friends. A video from the restaurant caught the incident and was played for the jury. Shell casings of the same caliber fired from a semi-automatic gun were found at the scene. No handgun matching the shell casings was found.

One victim suffered gunshot wounds to his back and chest. Another victim suffered two gunshot wounds to his abdomen. And the third victim took a bullet to his hip. Melikyan was not hit.

### B. The Interviews

#### 1. *Melikyan*

At about 8:30 p.m. on the night of the shootings, Detective Max Dahlstein of the Pasadena Police Department interviewed Melikyan at the police station. A recording of the interview was played for the jury. At the beginning of the interview, Melikyan acknowledged that he knew the identity of the shooter, but he feared that the shooter

---

[3]     The prosecution also presented expert gang evidence, which the parties set forth in their briefs. Because appellant does not challenge the gang evidence or the jury's true findings on the gang allegations, we do not summarize the evidence here, which is well known to the parties.

would "come[] after" him if Melikyan identified him. Melikyan said that the "whole thing . . . started" when Melikyan left the Armenian Power gang.

According to Melikyan, no one was allowed to be a member of Armenian Power until age 18, but younger associates would do "missions" for the gang, including shootings. The gang informed associates that refusing to perform a mission was disrespectful to the gang. Melikyan was once "jumped" by another gang when he claimed membership in Armenian Power. He ended up being hospitalized and was upset when no Armenian Power gang members visited him. While he was still in the hospital, Melikyan got a call from appellant, who was a rapper with the name Scrappy, and who had tattoos of an "A" on his right shoulder and a "P" on his left shoulder. Everyone knew Scrappy; he was "all over the [I]nternet." Appellant ordered Melikyan to commit a drive-by shooting when he got out of the hospital. Melikyan responded, "I'm not down for it no more," because he believed that Armenian Power did not care about him. Appellant warned Melikyan that he was disrespecting the "hood," and said he would talk to him later.

At 3:31 p.m. on the day of the shootings, appellant called Melikyan and told him to be at Connal's at 5:00 p.m. Fearing that he would be "jumped out" of the gang, Melikyan arranged for his friends to "have [his] back." Appellant and other Armenian Power gang members arrived at Connal's in a BMW. Appellant told Melikyan, "Now you're messed up. . . . You got out the hood." Someone then punched Melikyan on the side of the head, and he walked back, fell over his bike, and blacked out temporarily. Melikyan's friends rushed to his defense. Appellant told them that they did not know who they were "dealing with," and pulled out a gun. Appellant shot toward the sky and then started shooting at Melikyan's friends. Melikyan ran in between parked cars.

During a break in the interview, Detective Dahlstein created a photographic six-pack lineup that included appellant's photograph. Melikyan identified appellant's photograph as Scrappy. But he was hesitant to write his name on the lineup because he feared that it would let appellant know who made the identification. Melikyan was concerned that appellant would "go[] after" his younger brother and sister. Melikyan

4

told Detective Dahlstein that Armenian Power gang members "don't care about nothing"; to get respect, "they'll do whatever it takes."

### 2. Tigran Yegoryan

At about 10:30 p.m. on the night of the shootings, Detective Dahlstein also interviewed Tigran Yegoryan (Yegoryan) at the police station, and the recorded interview was played for the jury. Yegoryan was present at the shootings. Yegoryan knew Scrappy was an Armenian rapper who rapped about Armenian Power, and Yegoryan had seen his picture on the Web site "GL Records." Detective Dahlstein showed Yegoryan the same photographic lineup and asked him if he saw the gunman. Yegoryan pointed to appellant's photograph and said, "I'm pretty sure this should be Scrappy." When Detective Dahlstein asked Yegoryan if Scrappy was the gunman, Yegoryan responded, "Yeah."

### 3. Khachatur Buduryan

Detective Dahlstein also interviewed Khachatur Buduryan (Buduryan) at the police station on the night of the shootings. Buduryan was also present at the shootings. Buduryan told the detective that appellant was at Connal's, but Buduryan could not identify appellant as the shooter. Buduryan told the detective he was afraid of retaliation against him and his family.

### 4. Gasparian

The next morning, police officers interviewed victim Gasparian at the hospital, where he was being treated for gunshot wounds to his abdomen. Gasparian said he was "very close" to the shooter. When shown the photographic lineup and asked if he recognized anyone from the shootings at Connal's, Gasparian pointed to appellant's photograph and said, "Yeah, that's him."[4]

---

[4] At trial, Melikyan, Yegoryan, Buduryan and Gasparian, all (to some degree) recanted their statements to the police.

**Defense Case**

Edmond Varikyan (Varikyan) testified that he was friends with Melikyan and was at Connal's during the shootings. He saw the shooter, who was not appellant. Varikyan eventually contacted defense counsel to say that the wrong person was in custody.

Lilit Gasparian (Lilit) testified that she had been friends with appellant. On the night of the shootings, she picked appellant up at a plaza "somewhere" in the Tarzana or Reseda area at about 5:20 p.m. to take him to a "casual kickback" at her friend Nora's house. Everyone left at around 8:15 p.m.

One of the responding officers, who interviewed Melikyan and Yegoryan at the scene, testified that they both stated that they did not recognize any of the suspects in the shooting. They were both evasive and uncooperative.

Appellant's father, Martik Vardanyan (Martik) testified that after he first noticed appellant's tattoos in 2004 and learned what they stood for, he became scared. He asked appellant's uncle what could be done, and the uncle contacted some people he knew. Eventually a meeting took place with the leaders of Armenian Power, which included Martik and appellant. Martik told the gang leaders that appellant's family would constantly follow appellant, who would not be "a suitable person" for the gang. The gang leaders took appellant and separated him from the group. When they returned, the gang leaders stated that they would not have any more business with appellant, who was "not one of us and he cannot be with us anymore." Martik then took appellant to have his tattoos removed. The laser treatment was unsuccessful and appellant had an adverse reaction.

Appellant testified that he became a member of Armenian Power at age 15 or 16 to promote his music. He did not heavily participate in the gang because he was focused on his music. Appellant did not associate with Armenian Power gang members, and got the tattoos to promote his "gangster" image.

Before his arrest, appellant had never heard of Melikyan or Connal's. At the time of the shootings, appellant was at a party in Sherman Oaks. After the shootings, appellant was taken into custody and interviewed. A portion of his interview was played

6

for the jury. Appellant told the police he had been at a party. At trial, he admitted that he had lied about the names of the people who were at the party because he feared the police would mistreat them the same way they mistreated him when they took him into custody.[5]

**Prosecution Rebuttal**

Detective Dahlstein interviewed Varikyan a few days after the shootings in a waiting room at the hospital. A partial recording was played for the jury. Detective Dahlstein showed Varikyan the six-pack lineup and other photographs he had with him. Varikyan did not identify anyone. He admitted that his mother told him not to be a witness because she was afraid of what might happen. Varikyan had heard of Scrappy and had seen his picture on the Internet. Varikyan did not know if Scrappy was at Connal's during the shootings. Varikyan did hear Melikyan on the ground saying, "Scrappy off, Scrappy off, Scrappy off."

## DISCUSSION

### I. Motion to Suppress Identification Evidence

Appellant contends that his right to due process was violated by the trial court's denial of his motion to suppress the witnesses' identifications of him from the six-pack photographic lineup. We disagree.

#### A. *Relevant Proceedings*

After the preliminary hearing, appellant's first counsel, Mark J. Geragos (Geragos), filed a motion to suppress the witnesses' identifications of appellant, arguing that the six-pack photographic lineup used by police was impermissibly suggestive because appellant was the only Armenian pictured (in the second position). Geragos also argued that appellant's photograph was "illuminated and in sharper contrast" than the others. Written opposition and reply briefs were filed.

---

[5] According to appellant, the police burst into his house at 3:00 a.m. while he was working on some music on his laptop and threw him to the floor. One of the officers put his knee to appellant's neck and twisted his arm. Appellant was handcuffed and placed in the police car. When appellant asked what was going on, the officers would only say, "You know what you did. Don't play stupid. Don't play dumb."

At the hearing on the motion to suppress, which the trial court later described as "probably the strangest discussion, legal, [or] otherwise I have ever had in my life," Geragos argued that the other men in the photographic lineup did not look "remotely Middle Eastern." The trial court stated that it had "lots of Armenian friends" and was "not sure what an Armenian looks like." Geragos, who is Armenian, conceded that he does not look Armenian. The trial court asked Geragos, "How is it that your father who I have known since I have been in my 20's, and I am now 61 years old, I didn't find out he was Armenian until I found out that the family changed their names. I thought you were Greek." Geragos responded that he was from a small minority of Armenians from a certain region. Geragos then provided a discourse on the migration of Armenians to the Glendale area, argued that most Armenians have distinctive eyebrows, foreheads, eyes and noses, and offered to provide expert testimony on the subject of Armenian physical features.

The trial court reviewed and compared all six photographs in the lineup and noted the following: The man in position one appeared to be Russian or Slavic, but could "fit[] any number of categories"; appellant in position two could be Armenian, Hispanic, or "any number of things" and looked more Hispanic in the photograph than in person; the man in position three appeared to be Caucasian; the man in position four was a light-skinned Caucasian who seemed the "least likely to fit into this lineup"; the man in position five (directly below appellant's photograph) could be Armenian, Russian, Hispanic, or a "mixture"; and the man in position six "could be anything," "including Armenian." The trial court also noted that the background of the last photograph was lighter and "almost started to become the yellowish texture that is on [appellant]."

While stating that the lineup was not "ideal," the trial court found that it was not "anywhere near as bad" as Geragos suggested, that three of the photographs were "perfectly appropriate," and that the lineup did not place appellant "in a state of comparative physical uniqueness." Accordingly, the trial court denied the motion to suppress.

A jury was impaneled to hear the case. Geragos then declared a conflict of interest and the trial court declared a mistrial. Attorney Stephen R. Sweigart (Sweigart) substituted in for Geragos. After he was retained, Sweigart did not renew appellant's motion to suppress the identifications.

### B. Applicable Law

"A pretrial identification procedure violates a defendant's due process rights if it is so impermissibly suggestive that it creates a very substantial likelihood of irreparable misidentification." (*People v. Contreras* (1993) 17 Cal.App.4th 813, 819.) The defendant bears the burden of proving unfairness "as a 'demonstrable reality,' not just speculation." (*Ibid*.) The threshold test is whether the identification procedure was unduly suggestive and unnecessary. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.) If the test is met, the question becomes whether the identification was nevertheless reliable under the totality of the circumstances, taking into account such factors as the witness's opportunity to view the offender at the time of the crime, the witness's attentiveness, the accuracy of the witness's prior description, the level of certainty displayed at the identification, and the time elapsed between the crime and the identification. (*People v. Ochoa* (1998) 19 Cal.4th 353, 412; *People v. Wash* (1993) 6 Cal.4th 215, 244.) On appeal, the standard of independent review applies to a trial court's ruling that a pretrial identification procedure was not unduly suggestive. (*People v. Kennedy* (2005) 36 Cal.4th 595, 608–609; *People v. Avila* (2009) 46 Cal.4th 680, 698–699.)

### C. Analysis

As an initial matter, we reject the People's contention that appellant has forfeited his challenge to the denial of his motion to suppress the identification evidence because his second attorney failed to renew appellant's motion after the declaration of a mistrial. The People cite to *People v. Clark* (1990) 50 Cal.3d 583, 623–624 for the proposition that "While it may not be necessary to renew an objection already overruled in the same trial [citation], absent a ruling or stipulation that objections and rulings will be deemed renewed and made in a later trial [citation], the failure to object bars consideration of the

9

issue on appeal." But in *Clark*, there were two different penalty trials, and our Supreme Court noted that "Not only might a party elect different trial tactics at a second trial, but the trial court being more fully informed must be given the opportunity to reconsider the prior ruling." (*Id*. at p. 624, fn. omitted.) The Court also stated that "had the objection been renewed at the second penalty trial, the context in which the court would have weighed the probative value of the evidence against its possibly prejudicial impact would have been quite different." (*Ibid*. at fn. 32.) This is not the case here. No trial took place before the declaration of a mistrial. Thus, had appellant's second counsel renewed appellant's motion, the trial court would have been deciding the issue under the exact same circumstances.

Turning to the merits, we reject appellant's contention that the photographic lineup was impermissibly suggestive because he was the only Armenian included. We have reviewed the lineup. We agree with the trial court that at least three other men could be of the same nationality as appellant and that they appear similar in looks to appellant. We therefore agree with the trial court that the inclusion of their photographs was "perfectly appropriate." This case is like *People v. Brandon* (1995) 32 Cal.App.4th 1033, 1052. In finding that a photographic lineup was not unduly suggestive, the court noted that the defendant's photograph did "not stand out as the sole possible or most distinguishable choice" because it was "very similar" to at least two other photographs. (*Ibid*.) Moreover, "there is no requirement that a defendant in a lineup, either in person or by photo, be surrounded by others nearly identical in appearance. [Citation.] Nor is the validity of a photographic lineup considered unconstitutional simply where one suspect's photograph is much more distinguishable from the others in the lineup." (*Ibid*.)

Additionally, the witnesses' identifications of appellant were reliable under the totality of the circumstances. Appellant was known to the witnesses. They knew that appellant was an Armenian Power gang rapper who went by the name "Scrappy" and that he was "all over the [I]nternet." The witnesses knew that Melikyan was supposed to meet Scrappy that night at Connal's and that they were supposed to protect Melikyan. Melikyan told Detective Dahlstein that the shooter was Scrappy, and that he knew that

10

Scrappy had an "A" tattooed on his right shoulder and a "P" tattooed on his left shoulder. Similarly, Yegoryan had seen photographs of Scrappy on the "GL Records" Web site, and identified the gunman as Scrappy. Likewise, Buduryan told Detective Dahlstein that he had heard of Scrappy the rapper, and that Scrappy was present at the shootings.

As to the other reliability factors, the witnesses had a good opportunity to view appellant in person. Melikyan had a conversation with appellant before being struck on the head. Gasparian told the police that he was "very close" to the shooter, whom he identified as appellant from the lineup. It can also be inferred that the witnesses were particularly attentive to appellant when he arrived at Connal's, since they knew Melikyan was afraid of being jumped by appellant. The witnesses were also certain of their initial identifications, which were made without hesitation. Finally, at least three identifications were made mere hours after the shootings. (See *In re Carlos M*. (1990) 220 Cal.App.3d 372, 387 ["the lapse of time between the crime and identification was less than three hours, a period [of time] not likely to impair [the witness's] memory of the details of the attack"].)

We are satisfied that the trial court properly denied appellant's motion to suppress the witnesses' identifications.

## II. Motion in Limine to Exclude Appellant's Statements to Police

Appellant contends that his right to due process was violated when the prosecution impeached him with his allegedly involuntary statements. We disagree.

### A. Relevant Proceedings

Prior to trial, defense counsel Sweigart filed a motion in limine to exclude appellant's "statements to police obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [(*Miranda*)] and/or that were obtained involuntarily." At a pretrial hearing, the prosecutor informed the court that he would not be presenting appellant's statements to police (made on the night of the shootings after appellant was taken into custody) in his case-in-chief, but that he might seek to use the statements in rebuttal. Specifically, the prosecutor was referring to appellant's statements that he had been at a party but had lied to the police about the names of the people at the party. According to Sweigart, appellant

11

did not remember his *Miranda* rights being read to him. When asked if appellant had been read his *Miranda* rights and if there was "a form" that appellant "filled out and signed," the prosecutor responded, "I don't believe so." The prosecutor said that he believed appellant's statements were recorded, and that he would attempt to locate a copy of the recording.

On direct examination at trial, appellant testified that he had told the police he had been at a party at the time of the shootings, and that he did not give the police the "exact names" of the people at the party because he feared that the police would mistreat them the same way they mistreated him when they took him into custody. Appellant testified: "I was truthful where I was, not who I was with and who took me."

On cross-examination, the prosecutor sought to play a recording of a portion of appellant's interview with the police. At a sidebar, the prosecutor explained that he wanted to play the "pre-[*Miranda*]" portion to impeach appellant, pointing out that such use was permissible so long as the statements were voluntary. The prosecutor wanted the jury to hear what appellant sounded like when he was "spinning a yarn." Sweigart stated that based on his listening to the recording and reading the transcript, he could not "point to something that says that it was involuntary," but he was not willing to "stipulat[e]" that appellant's statements were voluntary.

The trial court reviewed the transcript and concluded that "it doesn't appear there is anything in the statement that makes the statement involuntary." The court noted Sweigart's objection and permitted the prosecutor to play the recording for the jury.

In the portion played for the jury, Detective Dahlstein asked appellant where he was between 3:00 p.m. and 6:00 p.m. on the day of the shootings. Appellant responded that he woke up around 2:00 p.m., got dressed, ate, and left his house around 4:00 p.m. to go to a kickback party in Reseda, arriving there shortly after 5:00 p.m. He stayed at the party until 9:00 p.m. Appellant did not know who hosted the party; he just hung out with "some females." Appellant was invited to the party by "Ello," a girl with whom he attended Granada Hills High School. His friend "Hakob" had dropped him off, but then left to take care of "some family thing." Appellant did not know Hakob's phone number.

12

### B. Applicable Law

In *Miranda, supra*, 384 U.S. at pages 444–445, the United States Supreme Court held that a statement obtained by an officer from a suspect during a custodial interrogation may be admitted in evidence only if the officer advises the suspect of both the right to remain silent and the right to have counsel present at questioning, and the suspect waives those rights and agrees to speak to the officer. A statement obtained in violation of *Miranda* may not be admitted in the prosecution's case-in-chief; however, it may be admitted to impeach the defendant if the statement is found to have been made voluntarily. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1092.) The test for determining whether a statement is voluntary, and not coerced, "is whether the defendant's will was overborne at the time he confessed." (*Lynumn v. Illinois* (1963) 372 U.S. 528, 534; *People v. Maury* (2003) 30 Cal.4th 342, 404.) "Voluntariness does not turn on any one fact, . . . but rather on the 'totality of [the] circumstances.'" (*People v. Neal* (2003) 31 Cal.4th 63, 79.) "'[C]oercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.'" (*People v. Guerra, supra*, 37 Cal.4th at p. 1093.) However, the presence of coercive police activity does not itself compel a finding that a statement is involuntary—the statement and the inducement must be causally linked. (*Ibid*.) Other factors to be considered include the length of the interrogation, its location and continuity, as well as the defendant's maturity, education, physical condition, and mental health. (*People v. Boyette* (2002) 29 Cal.4th 381, 411.) Another factor of significance is "the existence of any break in the chain of events from the initial application of coercion to the time of confession sufficient to insulate the latter from the coercive influences." (*People v. Sanchez* (1969) 70 Cal.2d 562, 573.)

We independently review a trial court's determinations as to whether coercive police activity was present and whether the statement was voluntary. (*People v. Guerra, supra,* 37 Cal.4th at p. 1093.) The trial court's findings as to the circumstances surrounding the confession, including the characteristics of the accused and the details of the interrogation, are reviewed for substantial evidence. (*Ibid*.)

## C. *Analysis*

Considering the totality of the circumstances, we find no merit to appellant's contention that his statements to police were the result of coercive tactics during his arrest that overbore his will. The force employed by the police in arresting appellant was reasonable—just hours earlier he had attempted to murder numerous people with a semi-automatic firearm at a public restaurant at dinnertime. Additionally, appellant's interrogation at the police station was separated in time and place from his arrest. Thus, there was a break in the chain of events sufficient to insulate his statements from the conduct of the police during his arrest. During the actual interrogation, there was no indication of any coercive police activity. The record does not reveal anything harsh or overtly threatening about the tone of Detective Dahlstein's questioning. Indeed, our review of the transcript of the short portion of the taped interview played for the jury reflects Detective Dahlstein questioning appellant in a straightforward manner about his whereabouts at the time of the shootings. There is nothing in the record to suggest that the interrogation was unusually lengthy or that appellant was deprived of sleep and food. Moreover, appellant did not break down and admit his involvement in the shootings; to the contrary, he denied being anywhere near the scene of the crime and lied to Detective Dahlstein about who he was with and where he was. "His resistance, far from reflecting a will overborne by official coercion, suggests instead a still operative ability to calculate his self-interest in choosing whether to disclose or withhold information." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 58.)

We are satisfied that appellant's statements to the police were voluntarily made and therefore admissible for the purpose of impeachment.

## III. Motion for a New Trial

Last, appellant contends that the trial court violated his right to due process by denying his motion for a new trial. Once again, we disagree.

### A. *Relevant Proceedings*

Prior to trial, appellant's third attorney, Melanie Baghdaian, filed a motion for a new trial on the ground that three new alibi witnesses had been discovered after his

convictions. The motion included a declaration from Lilit's cousin, Helen Manasaryan (Manasaryan), in which she stated that she had attended a party in Tarzana on the night of the shootings, with Lilit, appellant, and "Gevo," and that she had later been interviewed by private investigators. Prior defense attorney Sweigart provided a declaration stating that the case file he received from Geragos included a summary of an interview of Manasaryan conducted in February 2006 and a statement signed by her indicating the interview had been taped. These documents were attached to his declaration. He stated that he intended to call Manasaryan at appellant's trial, but that his investigator was unable to locate and serve her with a subpoena before trial. Sweigart put her name on his witness list. When he asked Geragos's office for a copy of the tape, he was told he had been given everything in the file.

The motion also included a declaration from Arutyun Keshishian (Keshishian), who stated that while working at his auto body repair shop in November 2011, appellant's father brought his car in and Keshishian remembered that he had seen appellant at a party in Tarzana in January 2006. Sevada Grigoryan (Grigoryan) also provided a declaration stating that he saw appellant at a party in late January 2006 at a residence "in Reseda or Tarzana." The prosecutor filed an opposition in which he argued that Manasaryan was not a newly discovered witness, and that Keshishian and Grigoryan could have been discovered with reasonable diligence. He further argued that there was no reasonable probability of a different verdict had the "newly discovered" witnesses testified at trial.

At the hearing on the motion, appellant's counsel argued that Manasaryan would have corroborated Lilit's alibi testimony. The trial court asked why Sweigart would have announced ready for trial and not moved for a continuance if Manasaryan's testimony was crucial. Appellant's counsel responded that she did not know, but that apparently there was a problem in locating her. The court questioned whether it could deem Manasaryan a newly discovered witness when the defense had created the issue by switching attorneys. Appellant's counsel further argued that Keshishian and Grigoryan

15

were "fortuitously discovered" after the trial, and that their testimony would corroborate appellant's alibi.

The trial court denied the new trial motion, finding that Manasaryan was not a newly discovered witness because the defense had interviewed her prior to trial and put her name on the witness list.  The court also found that Keshishian and Grigoryan could have been discovered with reasonable diligence because the party in question was small, their testimony would be largely cumulative to that of Lilit, and their testimony would not have rendered a different result probable because neither was able to specify the date of the party, and there was some confusion between them as to whether the party was in Tarzana or Reseda.

### B.  Applicable Law

Pursuant to section 1181, subdivision 8, a trial court may grant a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial."  In ruling on a motion for a new trial on the basis of newly discovered evidence, a trial court considers whether: (1) the evidence, not just its materiality, is newly discovered; (2) the evidence is cumulative; (3) the evidence would have rendered a different result probable on retrial; (4) the party could not, with reasonable diligence, have discovered and produced the evidence at trial; and (5) these facts are shown by the best evidence.  (*People v. Howard* (2010) 51 Cal.4th 15, 43.)

A trial court's ruling on a motion for a new trial is reviewed for abuse of discretion.  (*People v. Ochoa, supra,* 19 Cal.4th at p. 473.)  Indeed, "'[t]he determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.'"  (*People v. Delgado* (1993) 5 Cal.4th 312, 328, internal quotation marks omitted.)

### C.  Analysis

We conclude there was no error in the trial court's denial of appellant's new trial motion.

With respect to Manasaryan, we agree with the trial court that she was not a newly discovered witness. Sweigart was aware of her before trial and intended to call her at trial. When she could not be located for trial, he could have asked for a continuance or attempted to have her summarized interview admitted into evidence. Information known to a defendant prior to trial does not constitute newly discovered evidence for the purpose of a motion for a new trial. (*In re Hall* (1981) 30 Cal.3d 408, 420; *People v. Verdugo* (2010) 50 Cal.4th 263, 309 [letters reporting witness's hospitalization in psychiatric institution were not newly discovered evidence when defendant was aware during trial of the possibility of such hospitalization].)

With respect to Keshishian and Grigoryan, we agree with the trial court that they could have been discovered before trial with reasonable diligence. By all accounts, the kickback gathering was small, and the defense should have been able to ascertain the names of the attendees. At the very least, the hostess of the party should have known who was present at her house. Because appellant planned to present an alibi defense, identifying and locating alibi witnesses should have been his primary focus. (See *People v. Williams* (1962) 57 Cal.2d 263, 273 ["one who relies upon the ground of newly discovered evidence to sustain his motion for a new trial 'must have made reasonable effort to produce all his evidence at the trial, and . . . he will not be allowed a new trial for the purpose of introducing evidence . . . which would have been known to him had he simply exercised reasonable effort to present his defense'"].)

As to all three witnesses, the testimony of Manasaryan, Keshishian and Grigoryan would have been cumulative to that of appellant and Lilit. (See *People v. Cavanaugh* (1968) 69 Cal.2d 262, 270–271 [trial court did not abuse its discretion in limiting defendant to two alibi witnesses when testimony of other alibi witnesses would have been "cumulative in all essential respects"].)

Furthermore, testimony from the additional alibi witnesses would not have rendered a different result probable. Neither Keshishian nor Grigoryan could remember the date of the party at which they allegedly saw appellant. And Grigoryan was unsure whether the party was in Tarzana or Reseda. (See *People v. Guillebeau* (1980) 107

17

Cal.App.3d 531, 548 [alibi witnesses' ability to remember dates and details is important].) We agree with the People that a jury would have found it highly suspicious that Keshishian and Grigoryan were "fortuitously discovered" several years after the attempted murders.

Appellant argues that his new trial motion should have been granted because the prosecution's case was "weak." While it is true that the witnesses recanted their identifications at trial, their initial identifications of appellant were highly credible. This is particularly true of Melikyan, who knew appellant, spoke to him on the day of the shooting, arranged to meet him at the scene of the crime, and then spoke to him in person at Connal's. The other witnesses corroborated Melikyan's account, telling police that Melikyan had told them that he was planning to meet appellant at Connal's and that they were needed to protect him.

## DISPOSITION

The trial court is directed to modify the abstract of judgment by increasing the imposition of court security assessments to a total of $320 (§ 1465.8, subdivision (a)(1)) and by increasing the imposition of criminal conviction assessments to a total of $240 (Gov. Code, § 70373), and to forward the modified abstract to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
          ASHMANN-GERST

We concur:


_____, P. J.
     BOREN


_____, J.\
     CHAVEZ


18