Filed 4/30/13  P. v. Lahooti CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B246509 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA056849) |
| v. | |
| FARID LAHOOTI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Daviann L. Mitchell, Judge.  Modified and affirmed with directions.

Craig C. Kling, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, and Robert M. Snider, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Farid Lahooti appeals from the judgment entered following a jury trial in which he was convicted of evading an officer with willful disregard for the safety of persons or property (Veh. Code, § 2800.2, subd. (a)), and three misdemeanor counts of driving with a suspended license (*id.*, §§ 14601.1, subd. (a), 14601.5, subd. (a)). [1]

Defendant contends the trial court erred by denying him a hearing during trial on whether the single-photo field identification procedure used by law enforcement officers was unduly suggestive. Alternatively he contends the field identification procedure used violated his right to due process because it was unduly suggestive. We conclude the trial court committed no prejudicial error, if it erred at all. Defendant did not seek a hearing until the day after one witness testified regarding the field identification. Moreover, defendant asked for a "concurrent suppression hearing while" a particular witness testified. That witness was the third to testify regarding the field identification. In addition, the field identification was reliable, and thus the identification evidence was properly admitted even if the procedure was unduly suggestive.

Defendant further contends, and the Attorney General concedes, Penal Code section 654 precludes sentencing defendant on two of his three misdemeanor convictions for driving with a suspended license. We stay the sentences on two of the three misdemeanors.

## BACKGROUND

### 1. Defendant's possession of rented Dodge Charger

On July 9, 2012, Shabahang Movlaei rented a black Dodge Charger from Avis in Newport Beach.[2] Movlaei was married to defendant and they lived in Irvine. Although defendant did not have a valid driver's license, he also drove the rented Charger. The car was supposed to be returned to Avis on July 16.

---

[1] Undesignated statutory references are to the Vehicle Code.

[2] Date references pertain to 2012.

Movlaei and defendant argued on July 13, and on July 14 defendant's brother drove Movlaei to her parents' home in Winnetka, using his father's car. Movlaei remained at her parents' house. Defendant retained the Charger and its keys.

Around 8:44 p.m. on July 15, defendant arrived at the home of Movlaei's parents in the Charger and called out for her. Her father went outside and spoke to defendant. From inside the house, Movlaei told defendant not to return and threatened to obtain a restraining order against him. Defendant drove away in the Charger. A few miles away, he was caught on camera running a red light in the rented Charger in front of Pierce College. Movlaei identified defendant in the photographs from the red light camera, which included side profile and front images. The timing device used by the red light camera indicated defendant ran the red light at 8:44 p.m. on July 15.

## 2.    CHP pursuit of rented Charger

About 1:54 a.m. on July 16, a black Dodge Charger drove into the midst of a coned-off construction zone on the southbound 14 Freeway. California Highway Patrol (CHP) Officer Jason Murawski was parked on Avenue S, monitoring the construction zone from his marked patrol car. He testified the Charger drove through the coned-off area for about one-quarter mile before stopping near a pair of highway workers who appeared to speak to the driver. Murawski turned on his flashing lights and followed the Charger.

Highway worker Kevin Lee testified the Charger approached him, then Lee walked up to it and spoke to the driver from a distance of about five feet. Lee told the driver to stop and asked him where he was going. The driver said he did not know which way to go. Lee directed the driver toward the carpool lane, which was the only lane open for travel. The driver continued inside the coned-off area. Lee stepped in front of the Charger and again told the driver he could not go that way. The Charger then moved toward the open lane as the CHP car approached. Lee testified he interacted with the driver of the Charger for about five minutes and had gotten a good, clear look at him. The driver's window was completely down and the area was well-lit by the headlights of

3

Lee's work vehicle and floodlights all around. Lee noted that the driver was sweating profusely, slurring his words, and seemed to avoid eye contact. Murawski testified the area where construction workers spoke to the driver was very dark, but he also testified the construction workers had portable lights set up for their work.

Murawski testified that when he drove up behind the Charger it accelerated. Murawski turned on his siren and used his public address system to direct the driver of the Charger to pull over. The Charger did not comply, but instead drove on within the coned-off construction zone at about 100 miles per hour. As the Charger moved into the open lane, it struck cones and narrowly missed a highway worker. The Charger then accelerated to about 130 miles per hour. Murawski called for assistance and provided the license plate number for the Charger. During Murawski's pursuit, the Charger used the shoulder to pass a tractor-trailer, then quickly moved in front of the truck, requiring it to brake hard.

Several other CHP officers joined the pursuit. Each CHP car had its red and blue flashing lights and siren on. Officer David Muniz testified when he entered the freeway the Charger swerved toward his car. The Charger did the same thing when another CHP car from the Newhall office joined the pursuit.

The Charger drove onto southbound Interstate 5, then abruptly turned onto the truck bypass lanes of the Interstate 405 interchange, where it struck a curb, flattening both tires on the passenger side. The Charger slowed to about 70 miles per hour on the Interstate 405, then abruptly exited, ran a red light at the bottom of the offramp, then drove back up the onramp. The Charger began to weave, then made a sharp right turn off the onramp and vanished down a wooded embankment.

Muniz and his partner left their patrol car, slid down the embankment, and found the Charger against a tree with the driver's door open and no one inside. CHP officers, joined by Los Angeles Police Department officers, police dogs, and a helicopter, searched the area and set up a containment that lasted 13 hours, but the driver was not found.

Business cards and papers bearing defendant's name, the car rental agreement, and a mobile phone were found in the car. Muniz and CHP Sergeant John Williams examined the phone, including photographs therein. One of those photographs depicted defendant. Movlaei identified the phone at trial as the one both she and defendant used.

### 3. The field identification procedure

CHP Officer Raymond Lopez had been involved in the pursuit of the Charger on the 14 Freeway, but had been directed to drop out of the pursuit and return to the construction area. Lopez spoke to Kevin Lee about 3:00 a.m. Lee told Lopez he had been in contact with the driver for several minutes. Lopez asked Lee to describe the driver of the Charger. Lee said the driver was a male in his forties with "bluish green" eyes and dark hair, wearing a black T-shirt. Lee also said he thought the driver was Russian or Ukrainian.[3] When Lee was asked at trial why he thought the driver was Russian or Ukrainian, Lee explained, "I knew he wasn't like white. I mean, he was light complected. But I knew he wasn't like—to me he don't look Mexican. I knew he was some kind of other like nationality." Upon further questioning, he explained, "I mean, it just came to my head at that moment that he looked Russian." Lee continued, "I don't know what Russian looking is. But to me he looked Russian at the time."

Lopez related Lee's description of the driver to Williams by phone. Williams thought one of the photographs he had seen on the mobile phone found in the Charger— the photograph of defendant—fit the description given by Lee because the man in the photograph "had blue eyes and dark hair and appeared to be Ukrainian to me."[4] There was another man in some of the phone photographs, but he was not the right age group. Lopez asked Lee if he thought he would be able to identify the driver from a photograph.

---

[3] According to defense counsel's argument, defendant is Persian.

[4] Both the mobile phone found in the Charger and a black and white print of the photograph of defendant found on the phone were admitted in evidence at trial. The trial court allowed the jury to examine the photographs on the phone.

Lee expressed confidence he could do so. Williams used his own mobile phone to photograph the photograph of defendant, then sent it to Lopez to show to Lee.

Lee testified Lopez did not tell him where they had obtained the photograph. Lopez testified he told Lee "that we weren't able to locate the suspect, that he had left, fled the scene and that all we were able to find was a cell phone, and there were some pictures on there." Lopez also said he was going to show Lee one of the photographs. Lopez did not use any type of photo identification admonition, but he did not suggest that the photograph depicted the driver. He showed Lee the photograph Williams had sent and Lee immediately identified defendant as the driver of the Charger. Lopez asked Lee if he was positive, and Lee said, "Yeah, that's him. I know that's him. That's exactly him." Lopez communicated Lee's identification to Williams.

Lee testified he was certain of his identification, both when he made it and at trial. He also identified defendant at trial.

Lopez testified it was Williams's decision to show Lee the photograph and he obeyed Williams's directive. Williams testified he made that decision because none of the CHP officers had seen the driver and he believed exigent circumstances existed requiring a swift identification of the suspect, if possible. Williams explained that about 20 minutes before the CHP began its pursuit of the Charger, he had heard a broadcast by the Los Angeles County Sheriff's Department saying "they were responding to a possible armed robbery involving . . . a possible black Charger." Thus, Williams thought the driver of the Charger the CHP had pursued might have been involved in an armed robbery. In addition, the driver of the Charger pursued by the CHP had driven "in an insane manner," that is, quite dangerously, and it appeared he had fled on foot into a residential area. Williams testified preparation of an array of photographs would have taken an unreasonable amount of time.

The next day, CHP officers visited the address on file for defendant with the Department of Motor Vehicles, but "it was a bad address."

6

**4. Defendant's alibi**

Defendant's father and mother testified that on July 15, defendant's father picked up defendant in Irvine and brought him to their home, which was in either Mission Viejo (according to defendant's mother) or Irvine (according to defendant's father). Defendant slept at their house that night. The next morning all three of them went to Woodland Hills to have breakfast with relatives.[5] Defendant did not have any visible injuries.

After breakfast, defendant wanted to get his property out of his wife's car or tell his wife something, so defendant's father drove defendant to his father-in-law's house. They left when defendant's father-in-law threatened to call the police.

**5. Verdict and sentencing**

The jury convicted defendant of evading an officer with willful disregard (§ 2800.2) and three misdemeanor counts of driving with a suspended license (§§ 14601.1, subd. (a), 14601.5, subd. (a)).

The court sentenced defendant to three years in prison for evading an officer and imposed concurrent six-month terms for each of the three misdemeanor convictions.

## DISCUSSION

**1. Suggestive pretrial identification procedure**

**a. Defendant's motion and the trial court's ruling**

On the first day of testimony at the trial, Williams testified he had found the photograph of defendant on the mobile phone in the Charger, sent it to Lopez, and been informed by Lopez that "the Caltrans subcontractor" who had spoken to the driver of the Charger had identified the photograph of defendant as depicting the driver.

Before testimony resumed the next day, defense counsel told the court he "would like to run a concurrent suppression hearing while Officer Lopez is testifying." The court asked if counsel had filed a written motion and given notice. Counsel said he had not.

---

[5] Defendant's mother initially testified the family breakfast in Woodland Hills was on the morning of July 15, not July 16, but on cross-examination she testified it was on July 16.

The prosecutor objected and added, "[T]he defendant had no standing. He claimed it wasn't him, that he wasn't driving the vehicle. And he further claimed in court, I believe on the record in front of the judge, that the phone was not his. [¶] So where is his standing?" The court agreed with the prosecutor. Defense counsel then explained he was not attempting to suppress the phone, but "the identification as it was unduly suggestive." The court replied, "I don't know that that's a subject of a 1538 at this point." The court added, "And it's untimely. So that will not be granted. But it certainly goes to the weight, and you can make those arguments." Thereafter, first Lee, then Lopez testified about the field identification.

Defendant contends the trial court erred by refusing to conduct a hearing on the suggestiveness of the identification procedure. He further argues that even if the trial court did not err, the pretrial identification procedure violated his due process rights because it was unduly suggestive.

**b.    The relevant law and standard of review**

A defendant may challenge a witness's identification testimony as tainted by an unduly suggestive pretrial identification by an objection made at the time the evidence is offered, rather than a pretrial motion to suppress under Penal Code section 1538.5. (*People v. Vanbuskirk* (1976) 61 Cal.App.3d 395, 401 (*Vanbuskirk*).)

To determine whether an extrajudicial identification is so unreliable as to violate due process, the court must first determine whether the identification procedure was unduly suggestive and unnecessary. If it was, the court must determine whether the identification was nonetheless reliable under the totality of the circumstances. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 942 (*Gonzalez*).) A pretrial identification procedure is impermissibly suggestive if it creates a very substantial likelihood of irreparable misidentification, that is, it suggests in advance the identity of the person suspected by the police. (*People v. Sanders* (1990) 51 Cal.3d 471, 508; *People v. Ochoa* (1998) 19 Cal.4th 353, 413 (*Ochoa*).) The defendant bears the burden of proving unfairness as a demonstrable reality, not just speculation. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.)

8

A single-person showup is not inherently unfair.  (*Ochoa*, *supra*, 19 Cal.4th at p. 413.)  "[S]ingle-person show-ups *for purposes of in-field identifications* are encouraged, because the element of suggestiveness inherent in the procedure is offset by the reliability of an identification made while the events are fresh in the witness's mind, and because the interests of both the accused and law enforcement are best served by an immediate determination as to whether the correct person has been apprehended. [Citation.]  The law permits the use of in-field identifications arising from single-person show-ups so long as the procedures used were not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification."  (*In re Carlos M.* (1990) 220 Cal.App.3d 372, 387.)

Even where the defendant proves that the identification procedure was impermissibly suggestive, evidence of the identification and subsequent identifications is not excluded if the People can prove that the identification was nonetheless reliable. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1242, overruled on another ground in *People v. Edwards* (1991) 54 Cal.3d 787, 835.)  In determining the reliability of an identification following an impermissibly suggestive identification procedure, the court should consider factors such as the opportunity of the witness to view the suspect at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the suspect, the level of certainty demonstrated by the witness at the time of the identification, and the lapse of time between the offense and the identification.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.)

On appeal, we review the trial court's findings of historical fact deferentially, but "we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive."  (*Gonzalez*, *supra*, 38 Cal.4th at p. 943.)

c.      **No prejudicial error occurred**

Defendant was not required to file a written motion to challenge the pretrial identification procedure as unduly suggestive.  (*Vanbuskirk*, *supra*, 61 Cal.App.3d at

9

p. 401.) However, when the court made its remarks regarding a written motion, notice, and standing, it was under the erroneous impression—induced by defense counsel's description of the issue as a suppression hearing—that defendant was making a motion under Penal Code section 1538.5 to suppress the products of a search or seizure. That statute does require a written motion accompanied by proof of service and the motion generally must be made before trial.

After defense counsel explained he wanted to "suppress" the identification, not the phone or other seized evidence, the trial court arguably was required to consider defendant's motion to exclude the identification testimony and perhaps conduct a hearing outside the presence of the jury. However, that is not what defendant requested. He asked the court "to run a *concurrent* suppression hearing while Officer Lopez is testifying" (italics added). Williams had already testified (without defendant objecting to the admissibility of the identification testimony) that he sent defendant's photograph to Lopez, who later phoned Williams and said the Caltrans worker identified the photograph as depicting the driver of the Charger. Had the court granted defendant's request for a "concurrent suppression hearing" while Lopez was testifying, the jury would also have heard at least some of Lopez's testimony regarding the identification before the court could make a ruling on the motion. Moreover, because Lee testified before Lopez, the jury would also have heard both Lee's testimony regarding the field identification and his trial identification of defendant. Thus, even if the court erred by failing to hold a "concurrent suppression hearing," its error was harmless under any standard because the jury would already have heard most of the identification evidence. Had the trial court conducted the "concurrent suppression hearing," decided to exclude Lopez's identification testimony, and instructed the jury to disregard all prior identification testimony, it is extremely doubtful the jury would have been able to ignore completely its knowledge that Lee had identified defendant. Defendant's motion was therefore untimely when it was made, and any ruling on it during or after Lopez's testimony also would also have been untimely.

10

Even if we were to conclude the trial court erred by failing to conduct a hearing and that the pretrial identification procedure was unduly suggestive, we would nonetheless conclude that both Lee's pretrial and trial identification were reliable, and thus the identification evidence was admissible. Lee testified he interacted with the Charger's driver for about five minutes, under good lighting conditions. Although Murawski, who was observing the driver's interaction with Lee from within his patrol car at an unspecified distance, testified the area was dark, he also testified the construction workers had portable lights set up for their work. There was, at least, sufficient lighting to enable Lee to observe the driver well enough to give a detailed description, including the color of his eyes. His description apparently fit defendant well enough that, without knowledge of whether the photographs on the mobile phone in the Charger depicted the driver or someone else, Williams was able to select a photograph that Lee readily identified. Defendant has never contended he did not match the description Lee provided, except with respect to Russian nationality. Although defense counsel argued at trial defendant was Persian and "doesn't look Russian," the critical point was not whether defendant *was* Russian or, in some objective sense, *looked* Russian, but only that Lee *thought* defendant was Russian or looked Russian.

Lee also paid close attention to the driver of the Charger. He testified, "[M]y attention was all on him 'cause, I mean, he was in the closure. I had workers to the south of me." Finally, Lee made his identification of defendant from the phone photo about one hour after his interaction with the Charger's driver, and he was completely certain of its accuracy. Thus, all of the circumstances indicated Lee's field identification of defendant from the photo was reliable.

In addition, the identification was corroborated by evidence linking defendant to the rented black Charger the CHP pursued and strongly supported an inference he was its driver during the pursuit. The pursued car was the one rented by Movlaei from Avis. It was undisputed she did not take the Charger or its keys when she left defendant and moved to her parents' home in Winnetka. The testimony of Movlaei and her father about

11

defendant arriving at, and departing from, their house in the Charger around 8:44 on the night of July 15 was corroborated by the photographs from the red light camera near Pierce College, which apparently depicted defendant running a red light at 8:44 p.m. on July 15. Movlaei identified defendant in these photographs and defendant neither challenged this identification nor addressed these photographs in argument. Thus, the record established defendant was driving the Charger in the Winnetka-Pierce College area on the night of July 15 about five hours before the very same Charger drove into the construction zone on the 14 Freeway. Nothing in the record, not even argument, suggested the car was stolen or borrowed from defendant before it was driven into the construction zone and provoked a CHP pursuit.

For all of these reasons, the trial court's denial of defendant's request for "a concurrent suppression hearing while Officer Lopez is testifying" did not constitute prejudicial error, if it was error at all.

## 2.     Penal Code section 654

Defendant contends, and the Attorney General aptly concedes, Penal Code section 654 precludes sentencing defendant on two of his three misdemeanor convictions for driving with a suspended license. There was just one act of driving that violated two statutory sections for three reasons. Pursuant to Penal Code section 654, which prohibits punishment for several crimes arising from a single, indivisible course of conduct (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208), defendant may be punished for only one of the three convictions. Because the sentence imposed for each was the same, it is of no consequence which counts are stayed. Accordingly, we modify the judgment to stay counts 3 and 4.

The Attorney General argues the trial court should determine which counts should be stayed "[b]ecause count 4 is a priorable offense, while counts 2 and 3 are not." We disagree. Prior convictions under either section 14601.1 or section 14601.5 may increase punishment for a future violation of sections 14601 through 14601.2, and a prior conviction under section 14601.1 may increase punishment for a future violation of

12

14601.5.  Moreover, it is the *fact* of conviction of a violation of sections 14601.1 or 14601.5, not whether punishment for that conviction was served or stayed, that qualifies it as a prior for the purposes of increased punishment for a future conviction.  There is therefore no need to direct the trial court to determine which counts should be stayed.

## DISPOSITION

The sentences on counts 3 and 4 are stayed pursuant to Penal Code section 654 and the trial court is directed to issue an amended abstract of judgment reflecting the stayed terms, unless it has already done so.  The judgment is otherwise affirmed.

NOT TO BE PUBLISHED.


MILLER, J.*

We concur:


ROTHSCHILD, Acting P. J.


CHANEY, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13