Filed 12/21/21  P. v. Dain CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>YACOB DAIN,<br><br>        Defendant and Appellant. | A157756<br><br>(Sonoma County Super. Ct.<br> No. SCR7090531) |

A jury found defendant Yacob Dain guilty of home invasion robbery, kidnapping, burglary, assault with a firearm, and four counts of false imprisonment.  The trial court found defendant had two prior felony convictions, which qualified as both strikes under the Three Strikes law and as "serious felony" convictions under Penal Code section 667, subdivision (a) (§ 667(a)).[1]  The trial court imposed a determinate term of 30 years and a consecutive indeterminate term of 27 years to life in prison and issued a criminal protective order.

Defendant raises claims of evidentiary and instructional error, insufficiency of the evidence of the prior conviction allegations, and sentencing error.  We reject his two primary claims that (1) the victims' identification of defendant should have been excluded on the ground the in-

_____

[1] Further undesignated statutory references are to the Penal Code.

field identification procedure was unduly suggestive and (2) instructing the jury with CALCRIM No. 315 violated his due process rights.

The Attorney General concedes the false imprisonment conviction involving the kidnap victim (count 5) must be reversed because it is a lesser included offense of kidnapping, and that 10 years of the determinate term were improperly imposed under section 667(a). We accept these concessions. We also agree with defendant that the trial court's findings of prior strike/serious felony convictions were not supported by the evidence and the criminal protective order was unauthorized.

Accordingly, we vacate the sentence, reverse count 5, reverse the findings of prior strike/serious felony convictions, and strike the criminal protective order, and we remand the matter for retrial of the prior conviction allegations and resentencing. The judgment is otherwise affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

Around 2:00 a.m. on October 18, 2017, Jess and Brandi Smith and their two daughters were asleep in their home in Santa Rosa when Jess and Brandi were awakened by their dog barking. When Jess got up to check on the dog, he discovered three or four men entering his dining room through a large window. The intruders all had pistols, and they were wearing hoodies pulled tight around their faces. Jess ran toward his bedroom and was tackled from behind. His attacker put Jess in a chokehold, held a .45 caliber pistol to his head, and forced him to his bedroom. Another man pointed a gun at Brandi. The intruders cursed and said, "Where the fuck is it?" and ransacked their bedroom.

Jess was dragged to the garage, where there was a safe containing jewelry and firearms, and told to open the safe. After Jess attempted and failed to open the safe, he was struck in the head with the pistol. Jess yelled

2

out the combination; the men opened the safe but continued to demand, "where is it?" Jess was part of a marijuana collective, and he realized the intruders were looking for marijuana. He showed them a key to a shed, and they dragged him outside to the shed where he pointed to boxes that contained marijuana. One of the men told Jess, "shut up and lay here and I won't fucking shoot you," and the men started grabbing things in the shed. Eventually, the intruders left the shed, and Jess got up, ran to the front of the house, and saw a large SUV driving away.

Meanwhile, the Smiths' daughters (ages 20 and 9 years old at the time) had been forced into a bathroom. Brandi was dragged into the bathroom with her daughters. After it became quiet in the house, the older daughter left the bathroom and ran to a neighbor's house, and the neighbor called 911. Brandi also called 911.

The initial 911 call reporting the home invasion was made around 2:06 a.m. Ten minutes later, police pulled defendant over for a traffic stop in a shopping center parking lot about a mile from the Smiths' house. Defendant was alone in a black Kia Sorento.[2] In defendant's vehicle, police observed a jewelry box, a bracelet, and 14 one-pound bags of marijuana, all of which belonged to the Smiths.

The same early morning, Jess and Brandi were taken for an in-field identification (also referred to as a "showup") at the shopping center parking lot. Jess was not able to identify defendant, and Brandi said she was 80 percent sure defendant was one of the men who invaded her home. At trial, however, Jess identified defendant as one of the intruders who was "[t]hrowing [his] bed," and Brandi testified she was 100 percent sure

---

[2] The Kia was not the SUV Jess saw the intruders drive away in.

defendant was one of the intruders, and she had seen him push the mattress in her bedroom.

At trial, defense counsel did not dispute that defendant had the Smiths' property shortly after the home invasion and acknowledged this was "not a coincidence."[3] But the defense argued Jess's and Brandi's identifications of defendant were not credible and, disregarding their testimony, there was no evidence defendant had been in the Smiths' house.

## DISCUSSION

A. *Identification Procedure*

Defendant contends the identification procedure used in the investigation was so unduly suggestive that admission of Jess's and Brandi's identification of defendant violated his right to a fair trial and due process.

1. Background

Defendant filed a motion in limine to exclude all witness identifications of defendant arguing, "the field showup procedure [at the shopping center parking lot shortly after the home invasion] was tainted as a result of the unduly and impermissibly suggestive procedures used by law enforcement." He further argued that the witnesses' identification of defendant at the preliminary hearing was tainted by the earlier field showup procedure and that the preliminary hearing itself was another suggestive circumstance since defendant was presented by himself in jail clothing.[4]

---

[3] In his closing argument, defense counsel conceded, "Obviously, at some point after the events [at the Smiths' house] Mr. Dain met with the individuals in that home and obtained the property from that house."

[4] As mentioned, Jess was unable to identify defendant at the showup, but he identified defendant at trial. He also identified defendant at the preliminary hearing. Brandi identified defendant at the preliminary hearing as well.

4

Before ruling on the motion, the trial court held a hearing under Evidence Code section 402 where Jess and Brandi testified.

Jess testified that police officers came to his house after the incident and told him they had a suspect. He was taken in a police car to view defendant. An officer asked if he would be able to identify the men who were in his house, and he said, "I don't think so, man." They "drove up to an open vehicle with a man standing cuffed." Jess stayed in the police car and viewed defendant from a distance of about a car length. He could also see his marijuana and personal things inside the vehicle. Defense counsel asked whether the fact his marijuana was right there was part of his consideration, and Jess responded, "Yeah, I would assume he was the one—one of the people involved." But Jess did not identify defendant as one of the perpetrators at the field showup. He was "[i]n shock, very shaken" and still bleeding from his head injury at the time.

Prior to the preliminary hearing, Jess saw a photograph of defendant in the newspaper, but he did not take that into account when he testified at the hearing. Asked how he was able to identify defendant as one of the perpetrators at the preliminary hearing, Jess answered, "his face—basically his size, his face, just how I kind of remember, recall from that night." He also said he had a better view of defendant in the courtroom than in the parking lot. Jess thought the men had been in his house about 10 minutes, and he remembered seeing defendant's face in the bedroom when defendant was throwing furniture. Jess was able to see defendant's eyes, nose, mouth, and "facial shape."

Brandi testified she called 911, and the police responded at her house within a few minutes. She was taken by herself to the showup; her understanding was she was going to see a person who "may or may not have

5

been somebody involved in the incident." It was about 3:00 or 3:30 a.m., but defendant was standing in a well-lit area. Brandi did not recall seeing any property taken from her home at the time she identified defendant in the parking lot. She told the police she was 80 percent sure defendant had been in her home that night. Her identification was based on her observation of the center of his face, including the eyes, nose, and mouth. Brandi testified that she had a very clear view of defendant in her home and that she looked at him for about two or three minutes; he was one of the men who tossed her mattress, he did not hold a gun to her head. At the preliminary hearing, she based her identification on her memory of seeing defendant in her home, not because she saw his photo in the newspaper.

After hearing counsels' argument, the trial court denied defendant's motion to exclude the witnesses' identifications. The court found the showup procedure was not unduly suggestive, noting, "A lot happened in a very short period of time; open doors of a vehicle, not uncommon on the site of a stop, traffic stop, bringing one to the site with doors of cars open is not unheard of and doesn't smack of . . . a staging to make it unduly suggestive."

2.    Analysis

"In determining whether a defendant's right to due process is violated by the admission of identification evidence, we consider '(1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances.' [Citation.] A claim that an identification procedure was unduly suggestive raises a mixed question of law and fact to which we apply a standard of independent review, although we review the determination of historical facts regarding the procedure under a deferential standard." (*People v. Clark* (2016) 63 Cal.4th 522, 556–557.)

6

"The burden is on the defendant to demonstrate unfairness in the manner the show-up was conducted, i.e., to demonstrate that the circumstances were unduly suggestive. [Citation.] [The defendant] must show unfairness as a demonstrable reality, not just speculation." (*In re Carlos M.* (1990) 220 Cal.App.3d 372, 386 (*Carlos M.*).)

California courts have long recognized that, although suggestive, a single person field identification is not inherently unfair. (See, e.g., *People v. Bisogni* (1971) 4 Cal.3d 582, 587 (*Bisgogni*); *People v. Ochoa* (1998) 19 Cal.4th 353, 413; *People v. Garcia* (2016) 244 Cal.App.4th 1349, 1359 (*Garcia*).) "[F]or a witness identification procedure to violate the due process clauses, the state must, at the threshold, *improperly* suggest something to the witness—i.e., it must, wittingly or unwittingly, initiate an unduly suggestive procedure." (*Ochoa* at p. 413, italics added.) However, courts have weighed the risks and benefits of single person showups and consistently concluded, "the law favors [such identification procedures] when [conducted] in close proximity in time and place to the scene of the crime" (*In re Richard W.* (1979) 91 Cal.App.3d 960, 970) because "the advantages of prompt identification or elimination of suspects through an in-field showup outweigh the potential prejudice of such a procedure to the suspect" (*People v. Rodriguez* (1987) 196 Cal.App.3d 1041, 1049). (See *People v. Cowger* (1988) 202 Cal.App.3d 1066, 1071–1072 ["A prompt on-the-scene confrontation between a suspect and a witness enables the police to exclude from consideration innocent persons so a search for the real perpetrator can continue while it is reasonably likely he is still in the immediate area. [Citation.] Such knowledge is of overriding importance not only to the police and the public, but also to the suspect himself"].) Thus, " '[t]he law permits the use of in-field identifications arising from single-person show-ups so long

as the procedures used are not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification.' " (*Garcia* at p. 1359.)

Defendant has failed to demonstrate the identification procedure used in this case was impermissibly suggestive. He argues the procedure "singled [him] out" and "suggested that he was the suspect and was thus, unduly suggestive." He points to the circumstances that he was alone and handcuffed in a dark empty parking lot 1.2 miles from the Smiths' home, standing next to an SUV containing the Smiths' property. But, other than the fact that the Smiths' property was nearby, these circumstances were the result of the showup being conducted "in close proximity in time and place to the scene of the crime," which is *favored* under the law. (*In re Richard W.*, *supra*, 91 Cal.App.3d at p. 970, italics added.)[5]

Defendant asserts courts have "cautioned that a single person showup should not be used without a 'compelling reason,' " citing *In re Hill* (1969) 71 Cal.2d 997, and *Bisogni*, *supra*, 4 Cal.3d 582. A similar argument was rejected in *Carlos M.*: "Appellant contends, incorrectly, that single-person show-ups are impermissible absent a compelling reason. To the contrary, single-person show-ups *for purposes of in-field identifications* are encouraged, because the element of suggestiveness inherent in the procedure is offset by the reliability of an identification made while the events are fresh in the witness's mind, and because the interests of both the accused and law enforcement are best served by an immediate determination as to whether the correct person has been apprehended." (220 Cal.App.3d at p. 387.)[6]

---

[5] That defendant was handcuffed did not render the showup procedure unduly suggestive. (*Carlos M.*, *supra*, 220 Cal.App.3d at p. 386.)

[6] Alternatively, one could read the cases as illustrating that the circumstance of presenting a witness with an apprehended suspect *immediately after the crime* while the incident is fresh in the witness's mind

8

As to the fact that the Smiths' property was also in view, Brandi did not recall seeing the property yet was able to identify defendant at the showup, while Jess did see his property but was unable to make an identification. These circumstances would seem to disprove defendant's claim that the presence of the stolen property was unduly suggestive.

In sum, we conclude the in-field identification procedure used in this case was not unduly suggestive. Therefore, we do not reach the question whether the identifications were reliable under the totality of the circumstances. (*People v. Avila* (2009) 46 Cal.4th 680, 699 ["Because we have concluded the lineup was not unduly suggestive, we need not consider whether it was reliable under the totality of the circumstances"].)

Defendant further argues Jess's and Brandi's identification of defendant at the preliminary hearing was tainted by the unduly suggestive in-field identification procedure. Because we reject the premise that the showup was unduly suggestive, this argument fails. Finally, we note that defendant offers no authority for the proposition that preliminary hearing identifications are generally impermissibly suggestive.

B.     *CALCRIM No. 315*

Next, defendant contends the court violated his right to due process when it instructed under CALCRIM No. 315 that the jurors could consider the witnesses' level of certainty when evaluating testimony.[7] Since the

---

provides a compelling reason. (See, e.g., *In re Richard W., supra*, 91 Cal.App.3d at p. 970; *Garcia, supra*, 244 Cal.App.4th at p. 1359.) In contrast, the showup in *In re Hill* was two-and-a-half weeks after the robbery (71 Cal.2d at p. 1005), and the identification procedure in *People v. Bisogni* occurred many months after the robbery (4 Cal.3d at p. 587).

[7] The jury was instructed with the following version of CALCRIM No. 315. "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful

9

parties completed appellate briefing, the California Supreme Court has rejected this argument in *People v. Lemcke* (2021) 11 Cal.5th 644, 661 (*Lemcke*). There, the court concluded, considering all the instructions given

---

and accurate testimony. [¶] In evaluating identification testimony, consider the following questions:

"• Did the witness know or have contact with the defendant before the event?

"• How well could the witness see the perpetrator?

"• What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation?

"• How closely was the witness paying attention?

"• Was the witness under stress when he or she made the observation?

"• Did the witness give a description and how does that description compare to the defendant?

"• How much time passed between the event and the time when the witness identified the defendant?

"• Was the witness asked to pick the perpetrator out of a group?

"• Did the witness ever fail to identify the defendant?

"• Did the witness ever change his or her mind about the identification?

"• How certain was the witness when he or she made an identification?

"• Are the witness and the defendant of different races?

"• Was the witness able to identify the defendant in a photographic or physical lineup?

"• Were there any other circumstances affecting the witness's ability to make an accurate identification?

"The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

and the trial record, "listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating an eyewitness identification did not render [the defendant's] trial fundamentally unfair or otherwise amount to a due process violation."[8]

Specifically, our high court rejected defendant's current claims that the instruction lowered the prosecution's burden of proof (*Lemcke, supra*, 11 Cal.5th at p. 657 ["we find nothing in CALCRIM No. 315's instruction on witness certainty that operates to 'lower the prosecution's burden of proof' "]) and that it denied him a meaningful opportunity to present a complete defense (*id.* at p. 660 [the "argument that the certainty instruction violated his due process rights by denying him 'a "meaningful opportunity to present a complete defense" ' . . . fares no better"]).

Here, defense counsel was able to put on a vigorous defense on the issue of identity. He cross-examined Jess and Brandi in detail on their ability to see the perpetrators and whether they focused on the perpetrators' faces during the chaos of the nighttime home invasion. Defense counsel argued to the jury that the showup procedure was "tainted" and the witnesses were not liars, but they "were wrong" in their identification of defendant. The jury was instructed that the defendant is presumed innocent and the People have the burden of proving guilt beyond a reasonable doubt (CALCRIM No. 220), that "[p]eople sometimes honestly forget things or make

---

[8] In *Lemcke*, the trial court gave a version of CALCRIM No. 315 that listed 15 factors to consider in evaluating eyewitness identification evidence, and the defendant challenged the factor, "How certain was the witness when he or she made an identification?" (*Lemcke, supra*, 11 Cal.5th at p. 646.) In the present case, the trial court gave a version of CALCRIM No. 315 that listed 14 factors, and defendant challenges the identically worded factor challenged in *Lemcke*.

11

mistakes about what they remember" (CALCRIM No. 226), and that the "People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime" (CALCRIM No. 315). (*Lemcke*, *supra*, 11 Cal.5th at p. 658.) On this record, defendant has not shown that instructing the jury on the certainty factor in CALCRIM No.315 violated his due process rights.

In light of our rejection of defendant's first two appellate claims, his argument these two claimed errors cumulatively prejudiced him also fails.

C.     *Count 5 – False Imprisonment*

The jury found defendant guilty of kidnapping Jess (count 2) and false imprisonment by violence of Jess (count 5). Defendant argues count 5 must be reversed because false imprisonment is a lesser included offense of kidnapping. The Attorney General agrees, as do we. (See *People v. Chacon* (1995) 37 Cal.App.4th 52, 65 [false imprisonment is a lesser included offense of kidnapping]; *People v. Moran* (1970) 1 Cal.3d 755, 763 [where a defendant is convicted of a greater offense and a lesser included offense, "the conviction of [the greater] offense is controlling, and the conviction of the lesser offense must be reversed"].) Count 5 is reversed.

D.     *Prior Strike/Serious Felony Conviction Findings*

The district attorney alleged defendant had two prior felony convictions of participation in a criminal street gang in violation of section 186.22, subdivision (a) (§ 186.22(a)), with conviction dates in 2006 and 2007. These two prior felony convictions were used for multiple purposes in connection with the potential sentence in this case. It was alleged that these prior convictions were strikes under the Three Strikes law (§§ 667, subds. (d)-(i); 1170.12) *and* that they were serious felonies (§ 667(a)). Following the jury trial, there was a court trial on these allegations. The prosecution presented

evidence of the two prior criminal cases, including defendant's no contest pleas in both cases, and the court found the allegations true.

Defendant does not dispute that participation in a criminal street gang in violation of section 186.22(a) qualifies as a strike under section 667, subdivisions (b) to (i), and that it also qualifies as a serious felony under section 667(a). (See §§ 667, subds. (a)(4), (d)(1); 1192.7, subd. (c)(1).) Instead, defendant contends there was insufficient evidence he was convicted of a violation of section 186.22(a) "as that crime is now understood," relying on *People v. Strike* (2020) 45 Cal.App.5th 143 (*Strike*). We agree with defendant that *Strike* applies and that reversal and retrial of the two prior conviction allegations is required under these circumstances.

In *Strike*, the defendant pleaded guilty to gang participation in violation of section 186.22(a) in 2007, and the question on appeal was whether this 2007 conviction qualified as a strike in the defendant's later criminal case in 2017. (*Strike*, *supra*, 45 Cal.App.5th at pp. 146–147.) The question arose because the interpretation of the elements of the offense changed in 2012. As the *Strike* court explained, "At the time defendant entered his plea, an individual could be convicted of violating section 186.22(a) as a sole perpetrator. Five years later, in *People v. Rodriguez* (2012) 55 Cal.4th 1125 . . ., the California Supreme Court clarified section 186.22(a) is not violated by a gang member acting alone but is violated only when an active gang member commits a felony offense with one or more members of his or her gang." (*Id.* at p. 146.) Because the defendant entered his plea before *Rodriguez*, his conviction alone was "inconclusive on its face as to whether it qualified as a strike." (*Id.* at p. 150.) To prove the strike, "the prosecution could not simply rely on the fact defendant had suffered a conviction for violating section 186.22(a). The prosecution had to prove

13

defendant admitted all of the elements of the offense as explained by *Rodriguez*, including that he committed a felony offense with another member of his gang." (*Id.* at p. 150.)

The *Strike* court thus reversed the prior strike finding because there was "no indication in the appellate record that defendant admitted the factual allegations in the charging document as part of the factual basis for his plea." (*Strike, supra*, 45 Cal.App.5th at p. 154.) The court noted, however, that reversal of a true finding on the prior strike conviction allegation did not prevent retrial of the allegation. "[T]he appropriate remedy is to remand the case to the trial court for a new hearing on the prior strike allegation 'to permit the People to demonstrate to the trial court, based on the record of the prior plea proceedings, that defendant's guilty plea encompassed a relevant admission about the nature of [his] crime.'" (*Ibid.*, quoting *People v. Gallardo* (2017) 4 Cal.5th 120, 139.)

The Attorney General urges that *Strike* does not apply, noting that defendant in this case did not raise the issue below. To the extent the Attorney General is suggesting defendant's claim has been forfeited, we disagree. "No objection is necessary to preserve a challenge to the sufficiency of the evidence for appeal." (*In re I.A.* (2020) 48 Cal.App.5th 767, 776; see *People v. McCullough* (2013) 56 Cal.4th 589, 596 ["Parties may generally challenge the sufficiency of the evidence to support a judgment for *the first time on appeal* because they 'necessarily objected' to the sufficiency of the evidence by 'contesting [it] at trial.'" (Italics added)].)

The Attorney General also argues defendant's claim is in essence an attack on the "validity" of his 2006 and 2007 convictions and as such, it must be raised in a habeas corpus proceeding. As defendant responds, however, he "is not challenging the validity of his no contest pleas or seeking to undo

those pleas, but rather, is challenging whether the trial court's finding, *in the current case*, that those offenses constitute serious felony priors is supported by substantial evidence." The *Strike* court explained the trial court's task in deciding the prior strike allegation was to determine "whether [the] defendant had admitted all the elements of section 186.22(a) as now understood, when, in 2007, he pleaded guilty to violating section 186.22(a); specifically, whether defendant had admitted committing a felony offense with at least one other member of his gang." (*Strike*, *supra*, 45 Cal.App.5th at p. 146.) Likewise, in this case, the trial court's task was to determine whether, when he entered no contest pleas in 2006 and 2007, defendant admitted all the elements of gang participation as the crime is now understood. But the court's findings either way would not affect the *validity* of defendant's 2006 and 2007 convictions. The Attorney General's argument fails.

Here, the trial court did not consider whether defendant admitted all the elements of gang participation as the crime is now understood. The appropriate remedy under *Strike* is first to reverse the findings that defendant's 2006 and 2007 convictions of violation of section 186.22(a) qualify as strikes and serious felonies and vacate the sentence (which was based on the prior strike and serious felony findings), and second to remand the matter to permit the prosecution to retry the allegations based on the record of the prior plea proceedings. (*Strike*, *supra*, 45 Cal.App.5th at p. 154.) This will be our disposition here.

E.    *False Imprisonment is Not a "Serious Felony" Under Section 667(a)*

Defendant was convicted of home invasion robbery (count 1), kidnapping of Jess (count 2), first degree burglary (count 3), assault with a firearm of Jess (count 4), false imprisonment of Jess (count 5), false

imprisonment of Brandi (count 6), false imprisonment of the older Smith daughter (count 7), and of false imprisonment of the younger daughter (count 8). The trial court sentenced defendant to an indeterminate term for count 1 and imposed and stayed indeterminate terms for counts 2 through 5. The court imposed a determinate aggregate sentence for counts 6 through 8 and then added two five-year enhancements for the two prior serious felony convictions pursuant to section 667(a).

The five-year enhancement of section 667(a) only applies when a "person is convicted of a serious felony" in the current criminal case and has a prior serious felony conviction. Defendant argues the two section 667(a) enhancements in the determinate sentence, 10 years total, must be stricken because false imprisonment is not a serious felony. The Attorney General concedes the issue. As we have explained, we are reversing count 5, reversing the prior strike/serious felony conviction findings, vacating the sentence, and remanding for retrial of the prior conviction allegations. We nonetheless observe that the parties are correct on this issue. This means that, even if on remand and retrial the trial court finds defendant's 2006 and 2007 gang participation convictions qualify as serious felonies, it may not in any event impose five-year enhancements for counts 6 through 8 because false imprisonment is not a "serious felony" under section 667(a).[9]

---

[9] We note that defendant also argues defense counsel was ineffective in failing to move to strike the prior serious felony convictions under Senate Bill No. 1393 (2017-2018 Reg. Sess). (See *People v. Garcia* (2018) 28 Cal.App.5th 961, 971 [Senate Bill No. 1393 granted trial courts authority to strike or dismiss prior serious felony convictions for sentencing purposes where previously the enhancement under section 667(a) was mandatory].) We need not address this argument because the sentence is vacated. On remand, the trial court will impose a new sentence in accordance with this decision, and, if the prior serious felony allegations are found true after retrial, defense

F.      *Criminal Protective Order*

At the close of the sentencing hearing, the trial court stated it was issuing a three-year protective order for Jess, Brandi, and their two daughters. The prosecution had not requested a protective order, and the presentencing probation report did not recommend one. The court indicated the order was issued under section 136.2, subdivision (i)(1).

Defendant contends the order is unauthorized and must be stricken. He points out that section 136.2, subdivision (i)(1), is inapplicable because it only applies to defendants who have been convicted of crimes involving domestic violence and certain listed sex offenses. The Attorney General acknowledges that section 136.2 does not apply but argues the trial court had inherent authority to issue the order, citing *Townsel v. Superior Court* (1999) 20 Cal.4th 1084 (*Townsel*). We believe defendant has the better argument.

First, the issue is cognizable on appeal despite defendant's failure to object during the sentencing hearing. (See *People v. Robertson* (2012) 208 Cal.App.4th 965, 995 (*Robertson*) [noting a claim that a sentence is unauthorized may be raised for the first time on appeal]; *People v. Ponce* (2009) 173 Cal.App.4th 378, 381–382 (*Ponce*) [considering challenge to protective order made for the first time on appeal "[b]ecause this case involves the jurisdictional validity of the trial court's decision"].)

Second, courts have rejected "inherent authority" as a justification for protective orders issued in similar circumstances. In *Ponce*, the court explained: "The Attorney General argues that, notwithstanding section 136.2, trial courts, independent of statute, have inherent authority to issue appropriate protective orders to protect trial participants. . . . An existing

counsel will be free to argue the convictions should be dismissed in the interest of justice.

body of statutory law regulates restraining orders. ' "[I]nherent powers should never be exercised in such a manner as to nullify existing legislation. . . ." ' [Citation.] Where the Legislature authorizes a specific variety of available procedures, the courts should use them and should normally refrain from exercising their inherent powers to invent alternatives. [Citation.] [¶] Moreover, even where a court has inherent authority over an area where the Legislature has not acted, this does not authorize its issuing orders against defendants by fiat or without any valid showing to justify the need for the order." (*Ponce*, *supra*, 173 Cal.App.4th at pp. 383–384.)

In *People v. Corrales* (2020) 46 Cal.App.5th 283 (*Corrales*), the court rejected the respondent's appeal to "inherent authority" and distinguished *Townsel*. "*Townsel* was supported by 'circumstances' that raised 'serious concerns about juror safety.' [Citation.] The defendant in *Townsel* had been convicted of murdering one victim because she was a witness to a previous crime and was also convicted of attempting to prevent or dissuade a witness. Consequently the trial court's order was justified because of the defendant's history of interfering with the judicial process by killing or threatening witnesses. [Citation.] *Townsel* does not support the conclusion that a court can issue a post judgment protective order under section 136.2 based on its inherent authority." (*Id.* at p. 286.)

In *Robertson*, the court concluded a no-contact order was unauthorized where "the prosecutor did not make an offer of proof or argument justifying the need for a no-contact order," and "[t]here was no evidence that after being charged[,] appellant had threatened a witness or had tried to unlawfully interfere with the criminal proceedings." (*Robertson*, *supra*, 208 Cal.App.4th at p. 996.)

We find these cases persuasive. Here, the trial court did not offer any good cause or cite any circumstances to justify the protective order. The order is unauthorized and is stricken. (*Corrales*, *supra*, 46 Cal.App.5th at p. 287; *Robertson*, *supra*, 208 Cal.App.4th at p. 996; *Ponce*, *supra*, 173 Cal.App.4th at p. 386.)

## DISPOSITION

Count 5, false imprisonment of Jess Smith, is reversed, and the criminal protective order is stricken. The sentence is vacated, the findings that defendant's two prior convictions qualify as strikes under the Three Strikes law and serious felonies under section 667(a) are reversed, and the matter is remanded for retrial of the prior conviction allegations and resentencing consistent with this opinion. The judgment is otherwise affirmed.

_____
Miller, J.

WE CONCUR:


_____
Stewart, Acting P.J.


_____
Kline, J.*


A157756, *People v. Dain*

---

* Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.