[No. D009147. Fourth Dist., Div. One. May 16, 1990.]

In re CARLOS M., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
CARLOS M., Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1] Pursuant to California Rules of Court, rules 976.1 and 976(b), this opinion is certified for publication with the exception of part IV.

374

COUNSEL

Jan Stiglitz, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Robert M. Foster and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**FROEHLICH, J.**—Carlos M. appeals from an order adjudging him a ward of the court because, as a minor, he had committed an oral copulation by force, in violation of Penal Code[2] section 288a(d). (Welf. & Inst. Code, § 602.) He was placed on probation, ordered returned to Mexico (pursuant to Welf. & Inst. Code, § 738), and enjoined not to return to the United States without proper documentation.

Appellant raises several contentions on appeal. First, he argues the court erroneously denied his motion to suppress certain evidence, which he contended was the tainted fruit of an illegal search and seizure. Second, he contends certain pretrial and in-court identifications of him by the victim should have been suppressed, being the tainted products of an unnecessarily suggestive "one-person show-up." Finally, he argues the evidence is insufficient, as a matter of law, to show that he forced himself upon the victim or was aware that others had applied force to the victim or threatened her with bodily injury.

[2] All statutory references are to the Penal Code unless otherwise specified.

For the reasons discussed below, we affirm.

## I. *Factual and Procedural Background*

### A. *Prosecution's Case*

The facts, viewed most favorably in support of the judgment (*People* v. *Towler* (1982) 31 Cal.3d 105, 109 [181 Cal.Rptr. 391, 641 P.2d 1253]), indicate that at approximately 5:30 a.m. on August 22, 1988, the victim, Michelle D., was sitting alone near Balboa Park Drive and Laurel Avenue, waiting to meet a friend. She was approached by two Hispanic men, who had been sitting with four other Hispanic men on a nearby concrete wall, and asked if she wanted a beer. She agreed and began walking with the two men across a field toward a tree-lined area.

After walking a short distance, however, she sensed something was wrong, decided to turn back, and informed the two men she had changed her mind. The two men grabbed her, said "come on," and forced her to continue with them across the field. At the edge of the field the victim saw she was being led toward a trail into a bushy area and began struggling violently and screaming. The two men pulled her down the trail, ripping her pants off in the process. The older of the two men then pulled down his pants and ordered her to "give it to him," while the younger man pulled out a folding knife, released the blade, and began waving it in her face. When the victim saw the knife she began crying and pleading with the two men, but the older man forced her to her knees and then forced her to orally copulate him.

The victim continued struggling to escape, but the two men picked her up and carried her down the trail to what appeared to be a makeshift campsite. Although she continued to struggle and plead to be released, the two men ripped open her shirt, pushed up her bra, and forced her again to orally copulate the older of them. A few minutes later the victim became aware that the four other Hispanic men (whom she had seen sitting on the wall) were arriving at the campsite, laughing and talking. As these newcomers arrived, the victim continued screaming and struggling to escape.

Despite the victim's continued struggling and screaming, the first two men continued to hold the victim on the ground while the four newcomers laughed, pulled down their pants and began masturbating, and then three of the newcomers forced the victim to orally copulate them. A short time later

the victim was held down on the ground and her legs were forced apart; then one of the males, after putting on a condom, forced sexual intercourse on her. After he withdrew and motioned to another to take his turn, the victim began screaming more loudly. In response, a newcomer displayed the knife again, held it to the victim's neck, and told her to "shut up" or he would kill her. Thereafter, one of the newcomers forced her to orally copulate him while another of the newcomers forced intercourse on her.

The victim testified she was forced to have intercourse with five of the six men, the sixth man having unsuccessfully attempted penetration. The victim also testified she was forced into 10 separate episodes of oral copulation and 1 episode of anal penetration. During the incident, which lasted approximately one and one-quarter hour, the victim testified all of the men participated in pinning her to the ground and forcing her to orally copulate them and to engage in sexual intercourse. Eventually the men departed, leaving the victim alone. As she collected her clothes to leave, however, one of the men returned and tried to force her again to orally copulate him, but she vomited and began hitting him, driving him away.

The victim returned to Laurel Street, located a police officer at about 7:20 a.m., and reported the crime, first giving the officer generalized descriptions of the six assailants, and later giving him more detailed descriptions of their appearance and clothing. The victim was later taken to a nearby hospital for a medical examination designed for rape victims, arriving at approximately 8:45 a.m. The examination, which concluded at about 10:45 a.m., revealed the presence of sperm in her vagina, a lot of vegetation on her perineum, and bruises and scratches on her back, knees and breasts.

While receiving medical attention at the hospital, the victim was shown several men brought to that location by investigating officers. She identified several of the men as her attackers, basing such identifications on her recollections of the events surrounding the assault upon her. One of the persons identified was appellant. Appellant admitted to an investigating officer, during a custodial interrogation the following day, that the victim had orally copulated him.

At trial the victim again identified appellant as one of the four persons who had been sitting on the wall and who later joined in the assault. Although she could not recall which specific sexual act or acts appellant had forced her to perform, she recalled he was an active participant and had helped to restrain her. On cross-examination the victim conceded she was not "really able" to recognize appellant at trial and could not remember his

specific actions upon arriving at the crime scene, but she thought him to be one of the four who had been sitting on the wall and who had arrived later.

## B. *Defense Case*

The defense did not dispute that the victim had orally copulated appellant. The defense instead contended appellant had neither forced the victim to engage in sexual acts nor was aware that others had forced sexual activity on her. Alvaran, a defense witness who had already pled guilty to raping the victim, testified he was one of the men who had initially contacted her. He further testified that after sharing liquor and marijuana with her, he and a companion offered her drugs in exchange for sex, to which she agreed. She voluntarily accompanied them to the campsite without protest or struggle. Alvaran testified there were four other men at the campsite when they arrived, one of them being appellant, who was asleep. Alvaran claimed the victim voluntarily had sex with him and his companion and raised no resistance or protest until three other men subsequently arrived. Alvaran claimed the only protest was the victim's saying "Can't you let me go," but that the victim never screamed, fought or was forcibly restrained while having sex with the group.

Alvaran claimed appellant was asleep during the only period when the victim resisted having sex with the group; that the victim had orally copulated appellant without refusing, fighting, screaming or being physically restrained; and that appellant had done nothing to force the victim to orally copulate him. Alvaran claimed the knife was only displayed after all of the sexual activity had ceased and the group had already departed the campsite.

## C. *Procedural History*

Appellant was charged with four counts of rape in concert (§§ 261, 264.1), one count of penetration with a foreign object in concert (§§ 289, 264.1), and five counts of oral copulation in concert (§ 288a, subd. (d)). Appellant denied the allegations and unsuccessfully moved before trial to suppress certain evidence claimed to be products of an illegal search and seizure. Following a bench trial the court made a true finding as to one count of forcible oral copulation in concert (§ 288a, subd. (d)) and dismissed the remaining counts for lack of sufficient evidence. The court thereafter adjudged appellant a ward of the court, granted probation and ordered him turned over to the juvenile authorities in Mexico. This appeal followed.

## II. *Appellant's Motion to Suppress Was Properly Denied Because He Was Lawfully Detained and Transported for Identification*

Appellant unsuccessfully moved to suppress the hospital identification and the subsequent inculpatory statements made by appellant while in custody. He based his motion on the alleged unreasonably intrusive conduct of the police: both in the form of their detention of him in Balboa Park and then in terms of his transportation to the hospital where he was identified by the victim.

Appellant raises the same complaints on appeal. Because the reasonableness of an investigative detention and/or transportation is intimately tied to the facts and circumstances of each case (see, e.g., *People* v. *Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436]), our review necessarily encompasses an examination of the circumstances of this case.

### A. *Facts Relating to Detention and Transportation*

At approximately 7:20 a.m. the victim had flagged down a police officer and reported she had been raped by 6 young undocumented aliens, aged 18 to 23, within the last hour. She described one of them as having long hair and wearing a red shirt and jeans. She said the others were wearing jeans and sweat tops. These cursory descriptions were immediately broadcast to other officers. Shortly thereafter more detailed descriptions of the six suspects were obtained and broadcast. The second broadcast contained fairly detailed descriptions of five of the males, including one male described as being twenty to twenty-three years of age, five feet eight inches in height, weighing one hundred fifty pounds, of medium build, having brown eyes and long brown hair, and wearing a red shirt and jeans. The sixth male was described only as Hispanic, with medium-length brown hair and brown eyes, wearing jeans.

The two broadcasts were monitored by a park service officer and by an Officer Ferko. Approximately one hour later the park service officer saw two Hispanic men, apparently matching the broadcast descriptions, sleeping in an area approximately one-quarter mile from the site of the incident. The park service officer called for assistance, and Ferko arrived about 8:30 a.m. to provide assistance. Ferko observed the two suspects, one of whom was appellant, and believed they matched the broadcast descriptions in several particulars: ethnicity, sex, age, attire (both in red shirts).

Ferko approached the two suspects, awakened them and requested identification. The men, responding in broken English, gave their names and

stated they lived in San Diego. However, neither produced any documentation bearing his name, and neither gave an address. Ferko believed the appearance of at least one of the suspects corresponded to broadcast descriptions, and noted that the suspects were found within one-half mile of the crime scene. Ferko contacted his dispatcher with this information and received instructions to transport the suspects to a nearby hospital for possible identification by the defendant, who was undergoing an examination. Ferko then conducted a brief patdown search, handcuffed both men, placed them in the back of his car and transported them to the hospital. The drive to the hospital took about four to five minutes; and the entire detention, from the time appellant was awakened until the victim identified him, took about one-half hour.

## B. *The Initial Detention Was Reasonable*

■ An investigative detention is justified when the facts and circumstances known or apparent to the officer, including specific and articulable facts, cause him to suspect (1) a crime has occurred and (2) the person he intends to detain is involved in the criminal activity. (*In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957].) "Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience [citation], to suspect the same criminal activity and the same involvement by the person in question. The corollary to this rule, of course, is that an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith." (*Ibid.*)

■ Appellant complains Ferko lacked sufficient specific and articulable facts reasonably to suspect appellant as a perpetrator, since his only match with the broadcast description was that he was a Hispanic wearing a red shirt.[3] A vague description does not, standing alone, provide reasonable

---

[3] Appellant strongly emphasizes that the trial court's statement that appellant did not really match any of the descriptions demonstrates the unreasonableness of Ferko's actions. However, appellant ignores the context of that statement. The trial court found, as a factual matter, that the sixth suspect was only sketchily described, and that appellant did not appear to match "*more* than [the] generalized descriptions of the suspects." The court's statement that appellant did not "really match" the description of the sixth suspect was because appellant was wearing gray slacks, rather than the broadcast description of "jeans." In other respects, however, appellant did approximate the sketchy description of the sixth suspect, and Ferko stated "jeans" could be interpreted as including gray slacks. An officer, drawing on his training and experience (*People* v. *Superior Court* (1970) 3 Cal.3d 807, 827 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559]), could reasonably consider that the circumstances of the crime

grounds to detain all persons falling within that description (*In re Tony C., supra*, 21 Cal.3d at p. 898 [description of "three male blacks" in day-old burglary report insufficient to permit detention of all those falling within description]). However, the more particularized descriptions here (including age, hair and eye color, and hair length of the sixth suspect) (compare, e.g., *People* v. *Fields* (1984) 159 Cal.App.3d 555, 563-564 [205 Cal.Rptr. 888]), together with the *additional* circumstances known to the officer (i.e., appellant's presence within one-half mile of the crime site, within one hour of the crime report, and his being in the presence of another man who closely resembled a described suspect) amply justified the detention of appellant.

■ Of course, a defendant's mere proximity to a person suspected of criminal conduct does not itself provide grounds also to suspect the defendant of wrongdoing. (*Ybarra* v. *Illinois* (1979) 444 U.S. 85, 91-92 [62 L.Ed.2d 238, 245-246, 100 S.Ct. 338].) However, where (as here) a crime is known to have involved *multiple* suspects, some of whom are specifically described and others whose descriptions are generalized, a defendant's proximity to a specifically described suspect, shortly after and near the site of the crime, provides reasonable grounds to detain for investigation a defendant who otherwise fits certain general descriptions. (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1092 [126 Cal.Rptr. 898].)

## C. *The Transportation Was Not Unreasonable*

■ ■ ■ ■ ■ Appellant next complains that, even if the initial detention was valid, the subsequent handcuffing and transportation was so overly intrusive that it exceeded the constitutionally permissible boundaries of an investigative detention.[4]

---

(involving a violent rape by multiple assailants during early morning light) might inhibit the victim's ability to describe the assailants' attire with a haberdasher's precision. We must assess the totality of the circumstances, rather than dwell on isolated discrepancies, to determine whether Ferko could reasonably have suspected appellant of possible involvement.

[4] Appellant also argues the detention, lasting one-half hour, was impermissibly lengthy. There is no hard and fast limit on the permissible length of an investigative stop. (*United States* v. *Place* (1983) 462 U.S. 696, 709 [77 L.Ed.2d 110, 122, 103 S.Ct. 2637].) Rather, the test is whether the detention is temporary and whether the police acted with dispatch to quickly confirm or dispel the suspicions which initially induced the investigative detention. (*People* v. *Bowen* (1987) 195 Cal.App.3d 269, 273 [240 Cal.Rptr. 466].) Here, nothing suggests Ferko dallied. In not more than thirty minutes (and perhaps in less than fifteen minutes), Ferko arrived and awakened two sleeping suspects; got them on their feet; attempted to obtain names and identifications; determined a language barrier existed and that they lacked identifications; called to determine the location of the only person (i.e., the victim) who could confirm or dispel his suspicions; conducted a patdown search; handcuffed both suspects; walked them to his car and placed them inside; made a five-minute trip to the hospital; and walked two men, one at a time, to the place where the victim could identify them. Ferko's actions show commendable dispatch.

In *People* v. *Harris* (1975) 15 Cal.3d 384 [124 Cal.Rptr. 536, 540 P.2d 632], the court concluded that a so-called "transportation detention" (absent consent, probable cause to arrest or other unusual circumstances) impermissibly intruded on the detainee's constitutional liberties. Importantly, the rationale of the *Harris* court was that "[o]rdinarily there exist *less intrusive and more reasonable alternatives* to pre-arrest transportation. The officers may call or escort the witness to the detention scene for an immediate viewing of the suspect, or if they are able to procure satisfactory identification from the suspect, arrangements may be made for a subsequent confrontation with the witness. In addition, the consent of the suspect may be sought." (*Id.* at p. 391, italics added.) Indeed, *Harris* acknowledged factual situations could arise where it would be quite reasonable to transport the suspect to the witness: where the witness was "injured or otherwise physically unable to be taken promptly to view the suspect . . . [or where] the surrounding circumstances may reasonably indicate that it would be less of an intrusion upon the suspect's rights to convey him speedily a few blocks to the crime scene, permitting the suspect's early release rather than prolonging unduly the field detention." (*Ibid.*)

■■■ We conclude, under the facts of this case, the transportation was reasonable. Because Ferko spoke no Spanish, the language barrier prevented him from attempting to obtain consent.[5] The absence of identification, or even a residential address, rendered the "arrangements for subsequent confrontation" option moot.

The only option reasonably available to Ferko was to bring the victim and the suspects together as expeditiously as possible. Ferko understood that at the time he wished to arrange an in-field identification, the victim was undergoing a rape-victim examination. Ferko (from prior experience) believed this would require about two hours. Although the victim was not suffering severe physical injuries, she was presumably "unable to be taken *promptly* to view the suspects" in light of the trauma she had endured and the exigencies a rape-victim examination entails. To bring the victim to the suspects probably would have required Ferko to detain them for two hours to await the completion of the examination, or to interrupt the examination and seek to transport the victim.[6]

---

[5] Appellant contends his companion spoke English, and he should have been used as a translator to obtain information or consent under the rationale of *In re Dung T.* (1984) 160 Cal.App.3d 697 [206 Cal.Rptr. 772]. However, in *Dung T.* the arresting officer admitted knowing some members of the group understood English, and he simply ignored the opportunity to use them as a translator. (*Id.* at p. 716.) Here, Ferko testified he did not speak Spanish and suspects did not appear to understand his English. *Dung T.* has no application here.

[6] This option also could have impeded the investigation by permitting a deterioration of the extant physical evidence through lapse of time. In analogous situations the courts have recog-

The option selected by Ferko—transporting the suspects to the hospital rather than attempting to transport the witness from the hospital to the location of the suspects—was eminently reasonable. Even assuming it would have been possible to interrupt the hospital examination, time would have been wasted in finding the victim and causing termination of the examination. Since transportation time in either event would be the same, the likely detention of the suspects would be less by virtue of the option selected by Ferko—taking the suspects to the witness.

Even if we assume that other methods might have been available and less intrusive, we will not declare the methods chosen to be constitutionally unreasonable merely because "creative . . . *post hoc* evaluation[s] [allow judges to] imagine some alternative [less intrusive] means by which the objectives of the police might have been accomplished." (*United States* v. *Sharpe* (1985) 470 U.S. 675, 686-687 [84 L.Ed.2d 605, 616, 105 S.Ct. 1568].)

### D. *The Transport Detention Was Not an Unlawful De Facto Arrest*

██ Appellant finally argues the transport detention was conducted in such a manner (i.e., during a 30-minute detention appellant was subjected to a patdown search, was handcuffed, and was driven to the hospital) that it amounted to a de facto arrest, unlawful because Ferko lacked probable cause to arrest appellant.

██ The courts have long recognized that an investigative detention may, at some point, become so overly intrusive that it can no longer be characterized as a minimal intrusion designed to confirm quickly or dispel the suspicions which justified the initial stop. (*United States* v. *Sharpe, supra*, 470 U.S. at pp. 683-686 [84 L.Ed.2d at pp. 613-616].) When the detention exceeds the boundaries of a permissible investigative stop, the detention becomes a de facto arrest requiring probable cause. (*Dunaway* v. *New York* (1979) 442 U.S. 200, 212 [60 L.Ed.2d 824, 835-836, 99 S.Ct. 2248].) However, there is no hard and fast line to distinguish permissible investigative detentions from impermissible de facto arrests. Instead, the issue is decided on the facts of each case, with focus on whether the police diligently pursued a means of investigation reasonably designed to dispel or confirm their suspicions quickly, using the least intrusive means reasonably

---

nized that police need not abandon a crime scene before a proper investigation has been completed, in order to transport a victim to the site where the suspect is located, when the transportation of the suspect to the victim involves only a minimal additional intrusion on the suspect's freedom. (*People* v. *Gatch* (1976) 56 Cal.App.3d 505, 508-510 [128 Cal.Rptr. 481].)

available under the circumstances. (*United States* v. *Sharpe, supra*, 470 U.S. at pp. 685-688 [84 L.Ed.2d at pp. 614-617]; *People* v. *Bowen, supra*, 195 Cal.App.3d at p. 273.)

■■ Appellant argues the length of the detention demonstrates it was a de facto arrest. However, the courts have refused to adopt "any outside time limitation" on a lawful detention (*United States* v. *Place, supra*, 462 U.S. at p. 709 [84 L.Ed.2d at p. 630]), focusing instead on whether the length of the detention was "no longer than is necessary to effectuate the purpose of the stop." (*Florida* v. *Royer* (1983) 460 U.S. 491, 500 [75 L.Ed.2d 229, 238, 103 S.Ct. 1319].) As discussed above, the evidence clearly indicates Ferko acted with dispatch and selected "a means of investigation that was likely to confirm or dispel [his] suspicions quickly." (*United States* v. *Sharpe, supra*, 470 U.S. at p. 686 [84 L.Ed.2d at pp. 615-616].)

Appellant also argues the fact he was handcuffed and transported demonstrates it was a de facto arrest.[7] The fact that a defendant is handcuffed while being detained does not, by itself, transform a detention into an arrest. (*People* v. *Bowen, supra*, 195 Cal.App.3d at pp. 272-274.) Instead, the issue is whether the restraint employed exceeded that which was reasonably necessary for the detention. (*People* v. *Campbell, supra,* 118 Cal.App.3d at pp. 595-596.) Here, two men suspected of a violent crime were to be transported in the back of a police car by a single officer; the only thing separating the officer from the suspects was wire mesh, through which a suspect could place his fingers. Handcuffs were used to assure the officer's safety. Since a patdown search is not an infallible method of locating concealed weapons, the temporary use of handcuffs for safety purposes, used in this instance by a single officer briefly transporting two men suspected of a violent crime, did not exceed the restraint reasonably necessary to accomplish quickly the purposes of the detention.

[7] Appellant cites *People* v. *Campbell* (1981) 118 Cal.App.3d 588 [173 Cal.Rptr. 442] and *In re Jorge S.* (1977) 74 Cal.App.3d 852 [141 Cal.Rptr. 722] for the proposition that handcuffing a suspect, and then transporting him elsewhere while handcuffed, amounts to a de facto arrest. Neither case, however, involved a transportation for the limited purpose of an in-field identification. Instead, both cases involved restraining and transporting the defendant to a police station for purposes of custodial interrogation (*In re Jorge S., supra*, 74 Cal.App.3d at p. 856), or to the functional equivalent of a police station for further search of the detainee or his property (*People* v. *Campbell, supra*, 118 Cal.App.3d at p. 593). While the court in *People* v. *Harris, supra,* 15 Cal.3d 384 noted some circumstances might justify transportations *for in-field identifications* (*id.* at p. 391), " '. . . it is only in a rare case where, absent probable cause for arrest, the removal of a suspect *to a police station for further investigation* is constitutionally permissible.' [citing *People* v. *Courtney* (1970) 11 Cal.App.3d 1185, 1192 [90 Cal.Rptr. 370]]." (*People* v. *Harris, supra*, at p. 391, italics added.) Thus, *Harris* (as well as the United States Supreme Court—see discussion in *United States* v. *Sharpe, supra*, 470 U.S. 683-685 [84 L.Ed.2d at pp. 613-615]) indicates a police station detention for custodial interrogation may well be so overly intrusive that it exceeds a permissible detention and becomes a de facto arrest. We are not confronted with a police station detention here.

## III. *The Hospital Identification Was Not Impermissibly Suggestive*

██ Appellant next complains the victim's identification was tainted because it was the product of an unnecessarily suggestive "one-person show-up" at the hospital. ██ ██ ██ ██ Appellant argues it was impermissibly suggestive because appellant was handcuffed when viewed by the victim, and because appellant was shown to the victim immediately after she had positively identified another suspect.[8]

██ A single-person show-up is not inherently unfair. (*People* v. *Floyd* (1970) 1 Cal.3d 694, 714 [83 Cal.Rptr. 608, 464 P.2d 64].) The burden is on the defendant to demonstrate unfairness in the manner the show-up was conducted, i.e., to demonstrate that the circumstances were unduly suggestive. (*People* v. *Hunt* (1977) 19 Cal.3d 888, 893-894 [140 Cal.Rptr. 651, 568 P.2d 376].) Appellant must show unfairness as a demonstrable reality, not just speculation. (*People* v. *Perkins* (1986) 184 Cal.App.3d 583, 589 [229 Cal.Rptr. 219].)

██ Appellant fails to meet his burden. The record is devoid of any indication that police told the victim anything to suggest the people she would be viewing were in fact her attackers. While appellant claims the handcuffs influenced the victim to believe appellant was involved, the mere presence of handcuffs on a detained suspect is not so unduly suggestive as to taint the identification. (See *In re Richard W.* (1979) 91 Cal.App.3d 960, 969-971 [155 Cal.Rptr. 11].) Appellant also argues the victim, having first been shown appellant's companion and having identified him, could well have assumed that appellant must also have been involved. This contention is both purely speculative and contrary to the record. Shortly before the victim identified appellant and his companion, she had been shown two other suspects together; the victim positively identified one suspect, *but made no identification of his companion.* The record thus demonstrates the victim was amply able to distinguish persons she recognized from persons she did not recognize, and the fact a recognized attacker was shown with a

---

[8] We rest our decision on the ground that the single-person lineup identification procedure was not unfair in this case. However, we have doubt that a defendant can complain of an unfair lineup when, at the time of trial, he has admitted identity, basing his defense on consent of the victim. The lineup process is not in and of itself a violation of constitutional rights; it is the use of evidence produced by an unfair lineup which constitutes the violation. Typically, a claimed due process violation for use of identification evidence derived from an unduly suggestive lineup arises in cases where the defendant denies any involvement in the incident. (See, e.g., *People* v. *Nation* (1980) 26 Cal.3d 169, 178-181 [161 Cal.Rptr. 299, 604 P.2d 1051]; *People* v. *Bisogni* (1971) 4 Cal.3d 582, 586-588 [94 Cal.Rptr. 164, 483 P.2d 780].) We are unaware of any case permitting a defendant who admits involvement to claim prejudicial error based on a faulty lineup.

companion did not influence her to assume that companion must also have been involved.

 Appellant contends, incorrectly, that single-person show-ups are impermissible absent a compelling reason. To the contrary, single-person show-ups *for purposes of in-field identifications* are encouraged, because the element of suggestiveness inherent in the procedure is offset by the reliability of an identification made while the events are fresh in the witness's mind, and because the interests of both the accused and law enforcement are best served by an immediate determination as to whether the correct person has been apprehended. (*Id.* at pp. 969-970.) The law permits the use of in-field identifications arising from single-person show-ups so long as the procedures used are not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. (*Ibid.*)

 Our review of the totality of the circumstances (*Manson* v. *Brathwaite* (1977) 432 U.S. 98, 114 [53 L.Ed.2d 140, 154, 97 S.Ct. 2243]) convinces us the victim's hospital identification was reliable, rather than the product of an unduly suggestive show-up. The victim's "opportunity to view appellant at the time of the crime" was shown, since she saw appellant as one of the four men sitting on the wall before the attack, and had ample opportunity to see him at close range during the seventy-five minutes of the incident. Her degree of attention, while perhaps marginally impaired by the chaos of the attack, was sufficient to enable her later to provide relatively detailed descriptions of most of her attackers. The accuracy of her description of appellant, while inaccurate as to the type of pants he was wearing, was an otherwise generally accurate description. The victim's level of certainty of her in-field identification was clear, since she was positive on the suspects she identified at the hospital.[9] Finally, the lapse of time between the crime and identification was less than three hours, a period not likely to impair her memory of the details of the attack.

IV. *There Was Substantial Evidence to Support the Conviction**

. . . . . . . . . . . . . . . . . . . . . .

---

[9] Appellant attacks the certainty of her identification because she had less certainty in subsequent identifications. While the victim may well have had less certainty in subsequent line-up and court identifications, numerous factors (i.e., lapse of time after the crime, coupled with a mental block of details of a horrific experience; change of the suspect's appearance and attire) could explain this *later* uncertainty without impugning the certainty she had at the hospital, when events were still fresh in her mind and the attackers' physical appearances remained unaltered.

*See footnote, *ante,* page 373.

## DISPOSITION

The judgment is affirmed.

Todd, Acting P. J., and Nares, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 16, 1990.