Filed 5/23/25  P. v. Sias CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>             v.<br><br>BRYAN SIAS,<br><br>    Defendant and Appellant. | A168342<br><br>(Alameda County<br>Super. Ct. No. 21CR010710) |

A jury found Bryan Sias guilty of shooting at an occupied vehicle and assault with a semiautomatic weapon.  The jury found true special allegations that, in the course of the offense, Sias used a firearm and inflicted great bodily injury on Paul King.

Whether Sias was present at the shooting scene was hotly contested, and a focal point of that contest was King's testimony identifying Sias as the shooter.  Contending principally that a single-photo identification procedure used by the lead investigative officer during a hospital room interview of King was unconstitutionally suggestive, Sias appeals his conviction.

We see no error and will affirm.

1

# I. BACKGROUND

## A. *King's Prior Knowledge of Sias*

In August 2021, King, then 52 years old, lived on Hunter Avenue in Oakland. He had lived in the Hunter Avenue neighborhood "on and off" for about 40 years. Sias lived in the same neighborhood going back to around 2011, and the two knew one another from the area, even though they never actually talked.

King had no issues with Sias, who he knew only by the initial "B." But Sias "struck [King] as somebody [King] didn't want to get friendly with." It appeared to King that the feeling was mutual. King had last seen Sias less than six months before the shooting when King was visiting King's former girlfriend at her grandmother's house. Sias was also at the grandmother's house because at the time he was dating someone King knew.

## B. *The Shooting*

Sometime between 9:00 p.m. and 10:00 p.m. on August 17, 2021, King drove to a laundromat in Oakland, parked in a lot near the entrance, and waited for his friend Anthony Walker. Walker worked at the laundromat, and, for Walker's safety, King would often visit around closing time "and just sit until [Walker] close[d] [the laundromat] and lock[ed] up."

It was dark in the parking lot. As King sat in his car looking at his cellphone while waiting for Walker, he "hear[d] someone approaching" the passenger's side of the car and ask him, "What's going on?" or "What's up, blood? What you doing?" King's front driver's side window was all the way down and the lights inside the car were off. Without looking up from his phone, King responded, "Nothing much."

The passenger side door of King's car suddenly opened, causing the interior lights to come on and prompting King to ask, "Why did you open my door?" King then heard someone say, "For real?" The next thing he knew he

2

was shot in his stomach "[r]ight below my ribcage." King never saw the shooter's face, but he looked up enough to see "[t]he barrel of the gun pointing in [his] face." King heard only one voice and did not notice whether anyone other than the person who spoke was near him.

After being shot, King "fake[d] like [he] was dying." He "kind of shrunk down and stood still because [he] didn't know if [he] was going to get shot again." King then "shrugged down until [he] got a look at [his] door handle, and then [he] just made a mad dash for [his] door handle to get out the door." As King tried to get out of the car, he heard and felt two additional gunshots. He felt pain on his right hip and left femur; he "felt . . . [his] leg br[eak]." King then "fell out" of his car and crawled for about two feet; he was "terrified." As King laid on the ground, he looked under his car and saw on the passenger side a pair of shoes "just standing . . . together, like, they was waiting." The person then "walked off," and King saw "the headlights [of a car] backing up."

This sequence of events immediately leading up to the shooting happened quickly. From the time King heard someone walk up to the car to the time he was first shot, about a minute elapsed. After hearing what he thought were firecrackers being set off in close succession followed by someone screaming, King's friend Walker exited the laundromat and saw King lying on the ground next to his car. King told Walker that "somebody ran up to him and opened his car door and shot him." Walker asked King who shot him, and King said he did not know. Walker called 911.

Oakland Police Department (OPD) officers arrived on scene around 9:45 p.m. and found King on the ground with blood around him. Police "check[ed] [King's] body for injuries . . . and . . . noticed that he had two gunshot wounds in his upper body" one around his "lower rib cage, upper

3

abdomen area," "one to his lower back on his right side," and a gunshot wound in each thigh. King was "fading in and out of consciousness from his injuries." An officer asked King if he knew who shot him, and King said he did not know.

Officers canvassed the crime scene and found four spent .40-caliber casings in the parking lot. Video surveillance from the laundromat captured King's gold-colored 1999 Buick LeSabre and a red 2000 Oldsmobile Alero around the time of the shooting. Police ran the plates on the Oldsmobile and determined it was registered to Sias.

At trial, one of OPD's investigating officers described what the video shows as follows: "[Y]ou see . . . [the] red Oldsmobile . . . appear in the picture. Out of the vehicle you see a male exit the vehicle, walk up to the person in the . . . tan Buick, they're having a conversation for a little bit . . . and then you see the same subject that came out of the red Oldsmobile walk away with a . . . silver handgun, and he walks back into his Oldsmobile and then drives off. He puts it in reverse out of the parking lot." The video also captures the sound of gunshots.

## C. *Officer Chau Mai's Account of His Hospital Interview of King*

After the shooting, paramedics transported King to a hospital. King lost consciousness on the way. He awoke three days after the shooting and spent a total of about six weeks in the hospital. King had "11 bullet holes sutured down the front of [his] body, [his] chest area." At trial, King explained he was still using a cane to walk because his leg was "not 100 percent. It hurt[] a lot. And sometimes it ha[d] a tendency to just go limp; so [he] use[d] the cane in order to keep some of the pressure off [the leg] plus help maintain [his] balance if it . . . collapse[d] on [him]."

King explained at trial that he did not tell police at the scene who shot him because "[i]t wasn't really clear to [him]" at the time since he had not

4

seen the shooter's face.  Nearly three weeks after the shooting, on September 3, 2021, Officer Chau Mai, the lead investigating officer assigned to the case, visited King in the hospital to "take a statement from him."  Officer Mai took the statement while King lay in his hospital bed.  During what Officer Mai described as a "short" interview, recorded on his "body cam," King said, "I have no idea who would do this [to me]."  He reiterated, as he told officers at the scene, that "I just looked up and saw a barrel."  But he also added, for the first time, "I heard Brian's voice."  King was not able to say how old "Brian" is or how tall he is, but he said that he had known him for over 10 years.

King explained to Officer Mai the context of how he knew "Brian."  He said he had never talked to him or interacted with him, but he would see him around the neighborhood because "he used to be in a relationship with [King's] across-the-street neighbor" and King would see him "[c]oming to and from the residence."  King told Officer Mai he would hear "Brian" speaking "[a]ll the time" when he engaged in "[n]ormal conversations" and "argument conversations" across the street while King was in his front yard.  Once it became clear to Officer Mai that King knew who Sias was, he said, "I've got a photo for you," and proceeded to show King a single photo of Sias.  King "look[ed] at it and [said], 'that's the name of the voice I heard.' "

### D. *Differences in King's Account and Officer Mai's Account of the Hospital Interview*

At trial, both Officer Mai and King gave accounts of the hospital interview in which King identified Sias as the person who spoke to him just before his car door opened; only after the voice identification, they both testified, did Officer Mai produce any photos to confirm the identification.  But their testimony about the interview differed in some respects.  Officer Mai, for example, recalled King identifying Sias as "Brian," while King

5

recalled identifying Sias as "B.," a person whose name he learned from friends in the neighborhood only after he was released from the hospital.

The accounts of the interview given by Officer Mai and King also diverged on the issue of how many photos Officer Mai showed to King. King testified that Officer Mai showed him a six-pack photo array and that from the array he picked out Sias as "the person that [he] was talking to before [he] got shot." About the way in which he was shown the six-pack photo array, King testified Officer Mai did not give any sort of warning or instructions concerning how Mr. King was supposed to engage in the identification process, such as not to assume the suspect was shown. Officer Mai showed King all six photographs together. King recalled the photos being black and white photographs and about an inch-and-a-half square in size.

Officer Mai, on the other hand, testified that he showed King only one photograph. According to Officer Mai, he prepared a six-pack photo array that included Sias's photograph and brought it to the interview. The photos in the array were in color, not black and white. Ultimately, however, Officer Mai testified that he did not show King the six-pack array because King "informed me that day" that the voice of the shooter, a person named "Brian" who he "had known . . . for more than 10 years," was familiar to him. King "volunteer[ed]" this information before Mai decided against administering the six-pack identification procedure.

Officer Mai explained that, because King knew Sias before the shooting and recognized his voice, "I didn't feel the need to do a six pack." The video recording taken from Officer Mai's body camera was shown to the jury. Consistent with Officer Mai's testimony, the body camera video showed that he displayed only a single photo to King.

6

## E. *Attacks on Officer Mai's Credibility*

On cross examination, the defense confronted Officer Mai with an Oakland Police Commission disciplinary decision in an unrelated 2019 case. This disciplinary decision,[1] which was produced in compliance with the court's ruling on a pretrial motion by Sias under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*), showed that Officer Mai had written a police report that was inconsistent with information captured on his body camera video in the investigation of the 2019 case.[2]

Officer Mai was also pressed on cross-examination about whether he told King that Sias was a suspect before showing him a photograph of Sias. Officer Mai denied sharing any investigative information with King before King's voice identification of Sias. He did testify, however, that he "eventually" told King that the video surveillance showed only one shooting suspect. He claimed he gave King this information to allay King's concern that, if there had been more than one person involved, someone could still be at large who might wish to harm King and his mother.

The "unused" six-pack photo array was another significant focus of Officer Mai's cross examination. Officer Mai admitted that he did not mention anything about the six-pack photo array in his investigative report summarizing the hospital interview. He also admitted to destroying the original individual photos used to create the array. When asked why he

---

[1] The police commission decision upheld an OPD internal affairs finding.

[2] The cross-examination on this point did not address the circumstances of the misconduct in the 2019 case because the court limited the *Pitchess* production to the official finding of misconduct.

7

destroyed the original individual photos, Officer Mai stated, "They weren't used, so I shredded them."[3]

Officer Mai claimed that his decision to shred the original photos was not an "unusual" one. The police department has access to a lot of confidential and privileged information, he said, so it is fairly common for that information to be shredded "[t]o protect the confidentiality of the information that is within the document."

Officer Mai's explanation for why he abandoned his original plan to use a six-pack photo array was that once a witness or victim claims to personally know a suspect, "then generally the six-pack is obsolete. [Police officers] can then use a single photo generally to just verify it's the same person that [the witness is] referring to."

## F. *Closing Argument, Jury Verdict, Sentencing, and Appeal*

During closing argument, the defense sought to raise a reasonable doubt about Sias's guilt on a number of grounds, claiming among other things that there was no evidence of any motive for him to shoot King and no evidence he was even present at the shooting scene. King's identification of Sias—and the hospital interview when he first made that identification—was a major focus of attack.

The defense accused Officer Mai of lying about what happened during the hospital interview and suggested that, either in an unrecorded phone call

---

[3] Officer Mai explained that he was able to "recreate" an electronic version of the "officer sheet" showing the six small photos he used to prepare the array of six larger individual photos for display in the six-pack. But he first disclosed the "officer sheet" to the prosecutor (who advised defense counsel of its existence) after he was excused following his testimony in the People's case-in-chief. The People were ordered to produce the "officer sheet" at that point, and Officer Mai was then called to testify by the defense and was examined about the document.

with King before the hospital interview or in a portion of the interview that was not recorded on the body camera video, Mai informed King that Sias was the prime suspect, thus prompting King's recall of Sias's voice. According to the defense, the prior disciplinary finding showed that Officer Mai had lied before about what he actually did in a case investigation, and he lied again in this case, so his testimony should be completely disregarded.

The prosecution, for its part, argued that Officer Mai's prior disciplinary finding had nothing to do with "lying"; that the body camera video of the hospital interview confirmed the truth of Officer Mai's version of the interview; and that in any event, the car registration tied Sias to the shooting scene, which bolstered the reliability of King's identification of Sias.

After two days of deliberations, the jury hung on count one (attempted murder), but returned guilty verdicts on counts two and three (shooting at an occupied motor vehicle and assault with a semiautomatic weapon) with true findings of use of a firearm and infliction of great bodily injury. In a bifurcated second phase of trial, the court found true various aggravating factors. Sias received an aggregate sentence of 32 years to life in prison.

This appeal from the judgment of conviction followed.

## II. DISCUSSION

### A. *Timeliness of Appeal*

At the outset, we address the Attorney General's motion to dismiss the appeal. Although Sias had 60 days to appeal the judgment (Cal. Rules of Court, rule 8.308(a)), the Attorney General contends that he did not file his notice of appeal until July 18, 2023—61 days after the oral pronouncement of sentence. Accordingly, the Attorney General argues, the appeal should be dismissed as untimely. (Cal. Rules of Court, rule 8.308(a); *People v. Mendez* (1999) 19 Cal.4th 1084, 1094.)

Sias concedes his notice of appeal was tardy by a day, but argues ineffective assistance of counsel on the ground that his counsel failed to appreciate his time to appeal ran from the date of sentencing on May 18, 2022, mistakenly believing instead that the clock ran from entry of the abstract of judgment on May 19, 2023. "Notwithstanding the jurisdictional nature of the 60-day filing deadline," Sias argues, "the California Supreme Court has a long recognized" a policy, based on the remedial character of the right of appeal, of resolving appeals on the merits when that can be accomplished without doing violence to applicable rules. (*Silverbrand v. County of Los Angeles* (2009) 46 Cal.4th 106, 113, citing *In re Benoit* (1973) 10 Cal.3d 72.)

Sias invokes a narrow exception to the 60-day time limit for filing appeals in certain circumstances. Under this exception, a notice of appeal will be deemed constructively filed in timely fashion if the tardiness was caused by ineffective assistance of counsel and the appellant shows diligence in correcting it. (*In re A.R.* (2021) 11 Cal.5th 234, 243 [dependency appeal]*; In re Benoit*, *supra*, 10 Cal.3d at pp. 82–87 [criminal appeal].) We agree that this exception applies.

Sias's trial counsel has submitted a declaration explaining the relevant circumstances. We have no doubt there was ineffective assistance here and that Sias has shown diligence on this record. He appears to have timely communicated his desire to appeal; his counsel had a mandatory duty to pursue the appeal and took steps to accomplish that end, but, based on a misunderstanding about when the time to appeal began to run, made a one-day calendaring error in filing the notice of appeal. We accept his trial counsel's explanation and will proceed to resolve the appeal on the merits.

10

Accordingly, the Attorney General's motion to dismiss the appeal as untimely will be denied.

## B. *Denial of Motion to Suppress Evidence of Single-Photo Pretrial Identification*

Prior to trial, the defense filed a motion in limine seeking suppression of King's identification of Sias on the ground that the single-photo pretrial identification procedure Officer Mai used to elicit the identification was unconstitutionally suggestive, unnecessary, and unreliable. Sias contends it was error to deny this motion. We disagree.

In determining whether the identification at issue should have been suppressed, we must determine (1) whether the pretrial identification procedure Officer Mai used was unduly suggestive and unnecessary, and if so, (2) whether King's identification of Sias is nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification. (*Neil v. Biggers* (1972) 409 U.S. 188, 199–200; see *People v. Kennedy* (2005) 36 Cal.4th 595, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.) Under this test, "reliability is the linchpin in determining the admissibility of identification testimony" (*Manson v. Brathwaite* (1977) 432 U.S. 98, 114, 104–107), and the court examines the totality of the circumstances to determine reliability (*People v. Cunningham* (2001) 25 Cal.4th 926, 989).

An identification procedure is unduly suggestive if "it suggests in advance the identity of the person police suspect" (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 768), or causes the defendant to stand

11

out from the others in a way that suggests the witness should select him (*People v. Carpenter* (1997) 15 Cal.4th 312, 367, overruled on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176, 1189–1190 and superseded by statute on other grounds as discussed in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106).  In other words, "for a witness identification procedure to violate the due process clauses, the state must, at the threshold, improperly suggest something to the witness—i.e., it must, wittingly or unwittingly, initiate an unduly suggestive procedure." (*People v. Ochoa* (1998) 19 Cal.4th 353, 413; see, e.g., *People v. Carlos* (2006) 138 Cal.App.4th 907, 912 [finding photo array was unduly suggestive where defendant's photograph was the only one labeled with his name and identification number and "plainly made his photograph 'stand out' from the others"].)[4]

The burden is on the defendant to demonstrate unfairness in the manner the identification was conducted.  (*In re Carlos M.* (1990) 220 Cal.App.3d 372, 386 (*Carlos M.*).)  Specifically, the defendant must show that the circumstances of the identification were unduly suggestive as a "demonstrable reality, not just speculation." (*Ibid.*)  On appeal, the reviewing court defers to the trial court's factual findings but independently determines whether the identification procedure was unduly suggestive. (*People v. Thomas* (2012) 54 Cal.4th 908, 930; *People v. Clark* (2016) 63 Cal.4th 522,

---

[4] Since becoming effective on January 1, 2020, Penal Code section 859.7 has required all law enforcement and prosecutorial agencies to adopt regulations for conducting photo and live lineups with eyewitnesses and sets forth minimum requirements for identification procedures.  (Pen. Code, § 859.7, subd. (a).) Although Sias cited and relied on section 859.7 as well as constitutional standards in support of his motion in limine, he does not pursue any statutory argument here, except to the extent that the constitutional standards governing suggestive identification procedures and violation of those standards are referenced in the statute.

556–557.)  If we " 'find that a challenged procedure [was] not impermissibly suggestive, our inquiry into the due process claim ends.' " (*People v. Ochoa, supra,* 19 Cal.4th at p. 412.)  That is, " '[o]nly if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification.' " (*People v. Alexander* (2010) 49 Cal.4th 846, 902.)

Sias has failed to meet this burden.  California courts have consistently held that although single-photograph lineups are suggestive, they are not inherently unfair or unduly suggestive *per se*.  (See *People v. Sanchez* (2019) 7 Cal.5th 14, 36 ["[Single-photograph] showups are not necessarily unfair"]; *People v. Chavez* (2018) 22 Cal.App.5th 663, 674 ["A single person showup, or a single person photograph, is not inherently unfair or suggestive"]; *People v. Yonko* (1987) 196 Cal.App.3d 1005, 1008–1009 ["Showing the witnesses a single photo of the defendant is no more *impermissibly* suggestive than an in-court identification with the defendant personally sitting at the defense counsel table in the courtroom"]; see also *People v. Bisogni* (1971) 4 Cal.3d 582, 587; *Carlos M., supra,* 220 Cal.App.3d at p. 386.)

Whether showing a single photo rather than a full six-pack with appropriate admonitions was "unnecessary" is certainly arguable here.  It may well have been, for the simple reason that Officer Mai prepared a six-pack array.  But there is no evidence of undue suggestiveness.  Officer Mai did not tell King in advance of displaying Sias's photo that Sias was a suspect and nothing about the photograph itself invited King to identify Sias as the shooter.  Although King and Officer Mai disagreed about whether Officer Mai ever showed King a six-pack array, both Officer Mai and King agreed on the sequence of what happened during the interview.  First, King shared with Officer Mai that he recalled Sias's voice; then Officer Mai showed King either

13

one photo (Officer Mai's testimony) or the whole six-pack (King's testimony); and Officer Mai only mentioned the surveillance video showing one perpetrator at the scene of the shooting after King expressed concern that, if more than just one person had been involved, King or King's family could be at risk of retaliation. Thus, the record shows that Officer Mai shared information about Sias's presence at the scene only *after* King recalled hearing Sias's voice.

Through his various attacks on Officer Mai's credibility on cross-examination and in closing argument, Sias asked the jury to find that, in fact, Officer Mai had planted the idea in King's mind that Sias was the shooter. But the jury appears to have rejected that theory. The trial court certainly rejected it, having found that all King did was confirm a prior voice identification of Sias, someone King had known for years before the shooting. Now, to be sure, we are cognizant of the substantial credibility issues surrounding Officer Mai's testimony in this case, but because we do not sit as a fact finder we decline to accept the premise of Sias's undue suggestiveness argument. Under the reading of the record that Sias now urges, King's sudden recollection of Sias's voice during the hospital interview is attributable to manipulative suggestion by Officer Mai, given King's repeated statements prior to the hospital interview that he had "no idea" who shot him. But Sias had the opportunity to present that theory at trial, and the theory failed. It is not our role on appeal to second-guess the factual assessment the jury and the trial court made of what happened during King's hospital interview.

The bottom line on this record, in any event, is that the photo display procedure Officer Mai used was reliable. Applying the totality of the circumstances test and employing independent review, we conclude that

14

suppression of King's identification of Sias was unwarranted. It matters not whether King's response when shown the photo of Sias is characterized as an "identification" or simply a "confirmation" of a prior voice identification. Given King's undisputed prior relationship with Sias and the car registration circumstantially tying Sias to the shooting scene, we cannot say there is a substantial likelihood of irreparable misidentification, even assuming the identification procedure at issue was unduly suggestive. (*Neil v. Biggers*, *supra*, 409 U.S. at p. 198; *Carlos M.*, *supra*, 220 Cal.App.3d at p. 386.) In the absence of a basis for concluding that suppression was constitutionally compelled, the believability and weight to be given King's identification of Sias was a factual matter for the jury, which is exactly how it was treated by the trial court.

## C. *Denial of the Mid-Trial Defense Motion for Further Discovery Relating to the Adverse Disciplinary Finding*

### 1. Additional Background

Sias filed a double-barreled motion for pretrial discovery under Penal Code section 1054 et seq. and *Pitchess*, *supra*, 11 Cal.3d 531, as well as under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). By this discovery motion, he sought to obtain the confidential personnel records for the officers the prosecution might call at trial. He specifically sought discovery concerning "prior acts of fabrication, dishonesty and/or misstatements of fact no matter how catalogued" and "the fabrication of charges and/or evidence and the authoring or acquiescing to false or misleading police reports." The trial court granted *Pitchess* discovery and conducted an in-camera review of documents provided to the court by the OPD.

The trial court's *Pitchess* review resulted in compelled production of evidence showing that, as we have discussed, Officer Mai had been the subject of an OPD internal affairs investigation in 2019 in an unrelated case.

15

In that case, the Oakland Police Commission sustained a finding that Officer Mai had written a police report that was inconsistent with information captured by his body camera. The trial court ordered only that the misconduct finding be produced, without information concerning the circumstances on which the finding was made. The court did state, however, that it was willing to revisit whether Sias might be entitled to broader discovery should evidence developed in further investigation or at trial justify allowing him to delve in more depth into the matter.

Sias renewed his discovery motion at trial after the conflict in the evidence emerged concerning King's in-hospital identification of Sias—with King testifying, on the one hand, that Officer Mai showed him a six-pack photo array, and Officer Mai testifying, on the other hand, that he never showed King the six-pack array he brought with him to the interview upon learning from King that King had known Sias for years and recognized his voice at the scene of the shooting. In Sias's renewed discovery motion, he sought production of evidence concerning the circumstances of the misconduct finding against Officer Mai, including the body camera video and the police report in the 2019 case out of which the finding arose. Sias argued in his original motion that he needed this evidence to rebut any attempt by the People to "minimize" the significance of the misconduct finding against Officer Mai.

The trial court denied Sias's renewed motion for discovery. It deemed the requested information immaterial to factual issues at the heart of the case, explaining, "I don't think that what has transpired changes my ruling as far as the relevance of that prior [body camera video] from the 2019 incident, which Officer Mai has already been impeached with and has

16

already acknowledged that there was a sustained finding that he wrote a report that was inconsistent with the [body camera video] in that respect."

## 2. There Was No Error in Denying the Renewed Discovery Motion

Sias contends the denial of his renewed discovery motion was erroneous. According to him, the police report and the body camera video from Officer Mai's 2019 discipline case qualify as *Brady* material because they could have been used to impeach Officer Mai, whose role in procuring the identification of Sias from King was critical in this case; the People had constructive possession of these materials, Sias argues, and thus had a *Brady* obligation to produce it, even without a discovery motion. The Attorney General argues to the contrary, contending that Sias failed to bear his burden of showing that the evidence he sought was subject to production under *Brady*.

More specifically, the Attorney General argues that, if the police report and body camera video from the 2019 disciplinary case were subject to production, Sias should have filed another *Pitchess* motion seeking their production during trial, which he failed to do. Also, the Attorney General argues, the police report and the body camera video from the 2019 disciplinary case were not material here.

We conclude the Attorney General has the better of the argument. Assuming arguendo that a predicate for the trial court's expressed willingness to revisit Sias's pretrial discovery motions had been satisfied— and that, because of the way the testimony came in at trial, Sias had a reasonable basis for seeking production of the body camera video in the 2019 disciplinary case that he did not have prior to trial—we think the court was within its discretion to curtail further exploration in discovery and then in

17

the cross-examination of Officer Mai of what happened in this prior, unrelated case.

Sias had a full opportunity to confront Officer Mai with the misconduct finding in the 2019 case. The court conducted a *Pitchess* review which itself has not been challenged by Sias as having been deficient. We must presume that, mindful of what it saw in the case file from the 2019 disciplinary case, the court concluded the potential incremental value of compelling further Penal Code section 1054 discovery into the matter was not worth the time and distraction entailed. We also reject Sias's parallel *Brady* argument. Framed specifically in *Brady* terms, we are not persuaded he has shown that the police report or the body camera video from the 2019 disciplinary case were *material* to his defense, since he had other available means of impeaching Officer Mai. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1052.)

**D. *Denial of the Defense Motion to Dismiss as a Sanction for Destruction of Evidence***

**1. Additional Background**

Along with his renewed discovery motion during trial, Sias filed a motion to dismiss under *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*) and *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Youngblood*).

The background leading to this motion is as follows. The same day the trial court heard argument mid-trial on the renewed discovery motion, and after it ordered that the six-pack lineup be produced, the prosecutor "forwarded an email from . . . Mai containing the 'six pack,' " but it was incomplete. The individual photos comprising the array were missing. "Defense counsel inquired about the rest of the packet, which would contain the 6 individual photos." At that point, the prosecution informed defense counsel "that . . . Mai destroyed the remaining photos by shredding them." The defense moved immediately for dismissal, arguing that "Mai . . .

18

shredded the large photos from the 'six pack' sometime after his interview with Mr. King. The physical photos certainly appear to provide exculpatory information which cannot be duplicated. The information is essential to defend against the allegations that [Sias] was a lone shooter and shot Mr. King while he was seated in his car." "[S]hort of dismissal of all charges," defense counsel "request[ed] a late discovery instruction."

The court and parties discussed the matter outside the jury's presence. The prosecutor informed the court that Officer Mai "was able to recover the officer sheet that ha[d] all six photographs depicted on it. That was provided to [defense] counsel. [¶] [A]s for the individual printout sheets that Officer Mai did not show . . . Mr. King, [Officer Mai] did, in fact, shred those since he did not show them to Mr. King." The prosecutor continued: "But I asked [Officer Mai] to recreate them, if that would be difficult for him to do in light of [defense counsel's] request. And [Officer Mai] did recreate the photographs because nothing was signed on, and it has been provided to [defense] counsel."

The court resolved the *Trombetta/Youngblood* motion by deciding to give the jury an instruction concerning untimely disclosure of evidence (CALCRIM No. 306). The court instructed that the prosecutor's failure to disclose the six-pack photo lineup to the defense in a timely manner before trial "may deny [Sias] the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial."

## 2. There Was No Error

Sias argues the trial court erred in denying his motion to dismiss under *Trombetta* and *Youngblood* as a sanction for Officer Mai's destruction of evidence. We disagree.

"We review the trial court's decision on a *Trombetta/Youngblood* motion under the substantial evidence standard. [Citations.] . . . ' " ' " 'If the

19

circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " ' " (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 774.)  To test for a due process violation based on destruction of evidence by the government, "we adopt the following as our analytical approach.  First, did the destroyed evidence meet either the 'exculpatory value that was apparent' or the 'potentially useful' standard for materiality under *Trombetta* or *Youngblood,* respectively?  [Citations.]  Second, if the evidence qualified as 'potentially useful' under *Youngblood* but did not meet the *Trombetta* standard, was the failure to retain it in bad faith?" (*Alvarez*, at p. 774.)

Employing this two-step mode of analysis, we see no error.

First, given the production of the recreated photos in the array—none of which Sias now attempts to claim was selected so that he would stand out in some way—we find substantial evidence to support the trial court's implied finding that there was no failure to preserve evidence having apparent exculpatory value.  Second, even assuming the destroyed evidence qualified as "potentially useful," the trial court's implied finding that there was no bad faith in its destruction is supported by substantial evidence, since comparable evidence was available to the defense.  (*People v. Cook* (2007) 40 Cal.4th 1334, 1351 [affirming finding of no bad faith where the defendant had opportunity to cross-examine on photocopy of photograph book from which victim identified defendant's picture after the original of the book was destroyed]; see *People v. Yeoman* (2003) 31 Cal.4th 93, 126 [trial court did not err in denying motion to exclude victim's identification testimony where original photo from photo lineup was lost].)

We therefore conclude that the destruction of the original photos Officer Mai selected for the six-pack array he testified he never used does not rise to the level of a due process violation. And in the absence of a due process violation, the trial court was within its discretion to address the destruction of the original six-pack photo array in a variety of ways, including by giving a late discovery instruction. (*People v. Zamora* (1980) 28 Cal.3d 88, 99 ["courts enjoy a large measure of discretion in determining the appropriate sanction that should be imposed because of the destruction of discoverable records and evidence"].)

### E. *Cumulative Error*

Sias's final argument is that we should reverse based the doctrine of cumulative error. Having found no error on any other grounds, we find no cumulative error either.

## III. DISPOSITION

Affirmed.

STREETER, J.

WE CONCUR:

BROWN, P. J.
SIGGINS, J.*

---

* Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.